John R. McWEENEY, Plaintiff-Appellee,

v.

NEW YORK, NEW HAVEN AND HART-
FORD RAILROAD COMPANY,
Defendant-Appellant.

No. 135, Docket 25640.

United States Court of Appeals
Second Circuit.

Argued Jan. 8, 1960.

Decided July 29, 1960.

William Paul Allen, New York City (George Schylinski, New York City, on the brief), for plaintiff-appellee.

R. M. Peet, New York City (Edmund J. Moore, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This is an action brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60, to recover damages for injuries sustained by plaintiff McWeeney on March 23, 1956, while he was employed by defendant New Haven as a yard brakeman. McWeeney was struck by a moving freight car while he was on the side ladder of another car. There was conflicting evidence whether he was contributorily negligent and, if so, in what degree, and also whether he was totally or only partially disabled. He was a bachelor, aged 36 at the date of the accident and 39 at the time of the trial. His pay for the 13 weeks immediately preceding the accident was $1,187.61, an annual rate of approximately $4,800. The case was tried to a jury which awarded him a verdict of $87,000. Defendant's motion for a new trial was denied. Defendant appealed, claiming the trial court erred in denying ten requests to charge.

The appeal was argued to a court consisting of Chief Judge LUMBARD, Judge MOORE and the writer. We were unanimous in finding no error in the refusal to give the five charges requested with respect to defendant's negligence and the three sought in regard to plaintiff's contributory negligence. However, as will appear from the opinions herein, we were in disagreement as to the judge's refusal to grant Requests No. 17 and No. 18, namely:

"17. If you arrive at a verdict under the Court's charge in favor of plaintiff, you will not add any sum of money to the amount of the verdict on account of federal or state income taxes, since the amount awarded to the plaintiff by your verdict is not taxable income to the plaintiff within the meaning of these tax laws."

"18. If your verdict is in favor of plaintiff, you must calculate any past or future loss of earnings on the basis of his net income after deduction of income taxes."

Since similar issues arise frequently in trials in this Circuit, we referred the case to the court *in banc*, 28 U.S.C. § 46(a), which has considered it on the record and briefs previously submitted. We shall discuss the two requests in inverse order.

## I.

The proposal that juries in personal injury or death cases should always be instructed to excise from any recovery for loss of earning power the amount that plaintiff or his decedent would have been required to contribute to the fisc, has a surface appeal,[1] although it has not won assent from most courts that have considered it.[2] We join the majority, with a qualification set forth below.

It is not altogether clear whether the proponents of the instruction say that the tax adjustment is simple for a jury, that, although it is difficult, the jury's assessment of loss of earning power is already so complicated that Ossa may as well be piled on Pelion, or just that there is no burking the problem whatever the difficulties may be. We think none of these contentions is sound in the usual case.

Only three elements need now be found in determining damages from loss of earning power in a total disability case—future normal earning power, expectancy, and discount factor.[3] The third is charged by the court, often accompanied, as it was here, by a rule of thumb formula to simplify the jury's task. Expectancy is usually determined

---

1. Harper & James, The Law of Torts, § 25.12 at 1326–27.

2. The cases are cited in Morris and Nordstrom, Personal Injury Recoveries and the Federal Income Tax Law, 46 A.B.A. Journal 274, 276, fn. 19 (1960).

3. In a partial disability case there is a fourth, plaintiff's post-accident earning power.

by life tables and again is normally charged by the court, although a more refined analysis would permit reduction of the figures in the tables to take account of "the probable duration of plaintiff's earning capacity" (presumably with due regard to pension rights thereafter), 2 Harper & James, The Law of Torts, § 25.8, at 1317 and fn. 6 (1956), and other authorities cited in Conte v. Flota Mercante del Estado, 2 Cir., 1960, 277 F.2d 664, 670, and also of conditions unconnected with the accident that might have reduced plaintiff's expectancy below the normal term. American Law Institute, Restatement of Torts, § 924, Comment e. This leaves future earning power. As to that, of course, there are great imponderables, since existing compensation is only one element in the scale. But, whatever difficulties may inhere in this element of the formula, they do not justify the addition of other much more serious ones in the ordinary case.[4]

The instruction here requested and refused illustrates the delusive simplicity with which the subject has been invested. Defendant wished the jury to be told merely that "If your verdict is in favor of plaintiff, you must calculate any past or future loss of earnings on the basis of his net income after deduction of income taxes." All of us agree the jury needs more guidance than that. But what is the alternative? The trial court could begin by instructing that under the optional tax provided in § 3 of the Internal Revenue Code, which McWeeney was entitled to elect, the tax on a bachelor's income of $4,800 would have been $773. This is still simple enough but the jury must determine not what McWeeney's tax on $4,800 now is but what it would be over his expectancy. In these lower brackets the amount of the tax and its percentage relation to earnings are enormously affected by the number of exemptions. The simple act of matrimony, coupled with the filing of a joint return, would reduce McWeeney's tax from $773 to $620. Is the jury to consider the likelihood of this not unusual occurrence? If the lady brought two children with her, or if these were produced in the ordinary way, the tax would be cut in half, to $380. Each additional child would bring a further tax saving of $110, so that a total of five would make the tax nominal. While such fecundity might be unlikely in a plaintiff of 39 the rule here framed for McWeeney must apply to men who evidence greater interest in marriage and parenthood, and the rise in the birth rate is a phenomenon of our age.[5] Is the jury in each case to speculate, or hear testimony, on the procreative proclivities and potentialities of the plaintiff and his spouse? Moreover, children are by no means the only source of exemptions; § 152 of the Code lists nine other categories. Nor will it do to say that this is over-refinement. If a defendant claims that a plaintiff in these brackets would have had to pay 20% of his income in taxes, the court cannot deprive the plaintiff of an opportunity of showing that he would not have paid anything of the kind, and once the rule were adopted, we see no way of eliminating the question of potential babies and the exemptions they trail with them.[6]

4. We know all too little about how juries actually deal with this and other problems in fixing damages in personal injury cases. Happily, this deficiency seems in a fair way to be remedied by the forthcoming publication of the studies made by the Jury Project of the Law School of the University of Chicago. See Kalven, The Jury, the Law and the Personal Injury Damage Award, 19 Ohio St.L.J. 158, 159 (1958).

5. See the figures in W. W. Rostow, The Stages of Economic Growth (1960), pp. 80-81.

6. See Southern Pacific Co. v. Guthrie, 9 Cir., 1951, 186 F.2d 926, 927, certiorari denied, 341 U.S. 904, 71 S.Ct. 614, 95 L. Ed. 1343, where the court said on a rehearing *in banc*, "We think the [district] court's view that the net take home pay, after taxes, would represent the actual loss, is correct; but we are now convinced that we cannot tell how much this will be." This was because the plaintiff "could look forward to an additional exemption after age 65, and because he was married, the split income features of the law would give two additional exemptions when his wife reach-

Having duly instructed the jury how to estimate the number of plaintiff's probable exemptions, and the dates when these will come into being, and on rate brackets and deductions, and the treatment of other income of the plaintiff not affected by the accident,[7] the court would necessarily encounter another problem. Even the best designed instruction that stopped at that point would be unfair to the plaintiff. This is because, as proponents of the instruction recognize, the product of plaintiff's lost earning power ex-tax and his expectancy will have been discounted to produce "that sum of money which if invested at a fair rate of return will yield annually the amount by which the plaintiff's earning capacity has been lessened and which will at time of end of the plaintiff's life expectancy be reduced to zero. This takes into account the fact that money earns interest each year; and it should be remembered that *this interest is taxable*. Therefore, if a court is going to use income after taxes as a measure of plaintiff's loss, it must add back the taxes which would be due on the interest earned—else the award would not fully compensate for the loss." [8]

All this is simple enough to state but how is the jury to apply it? If we suppose that plaintiff would purchase an annuity with the lump-sum previously determined, it will hardly help the jury to be told, in the language of § 72(b) of the Internal Revenue Code, that "Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date)." Of course the court could itself calculate the exclusion ratio and charge what proportion of the annual payments would be taxable, thus leaving to the jury only the task of determining the amount of each annual payment that would be taxable, the tax thereon, and the discounted amount of the sum of such tax payments, and adding this to the ex-tax award. But here a new complication seems to arise. For a portion of the periodic payments on this sum, which is to be added to fund plaintiff's tax liability, would itself be subject to tax.

It is answered that, however unrealistic it may be to suppose that a jury could properly make the series of calculations required,[9] the worst result from giving an instruction would be better than the best result from not giving one. This ignores that, by imposing on the jury a task that the jury cannot reasonably be expected to perform, we would be likely to impair the quality of its performance in areas of its true competence. It ignores also that although failure to instruct the jury to reduce a verdict to take account of income taxes on plaintiff's lost earning power, when viewed in isolation, may tend to make verdicts too high, there are at least two

---

ed 65, something about which we cannot tell." If an appellate court is thus unable to determine "the net take home pay" of a plaintiff aged 58 (where, in fact, it would seem that actuarial tables could have been so used as to provide an answer), what is a jury to do with one thirty years younger?

7. It has been proposed that this be ignored, see Morris and Nordstrom, supra note 2, p. 328.

8. Morris and Nordstrom, supra note 2, at 328. See also Nordstrom, Income Taxes and Personal Injury Awards, 19 Ohio St.L.J. 212, 227–28 (1958).

9. See Armentrout v. Virginia Ry., D.C.S. D.W.Va.1947, 72 F.Supp. 997, reversed on other grounds, 4 Cir., 1948, 166 F.2d 400, 4 A.L.R.2d 1064, where the court's eight pages of calculations give an example of what the jury might be asked to do.

We have not dealt with the added problems relating to state income taxes, which the proponents of the instruction, quite logically, seek to have included. Mc-Weeney had first worked in Connecticut, then in Florida. Was the jury to determine whether McWeeney would have remained a New Yorker or moved to a state without an income tax—and when?

other factors that countervail this in the ordinary case.[10]

The first is inflation. Though some courts have sanctioned instructions permitting the jury to take into account inflation between the injury and the trial, there is little or no authority in favor of charging the jury to take future inflation into account, see 2 Harper and James, The Law of Torts, § 25.11 (1956). Yet there are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity,[11] and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor. The effect of inflation of 1% a year over McWeeney's 29-year expectancy at trial would go a long way toward offsetting any excess in the verdict due to failure to deduct income tax.[12]

The second offsetting factor is that the supposedly overcompensated plaintiff does not retain his entire recovery or anything like it. Whatever the reasons of history or policy for the American practice of generally not awarding attorneys' fees to the successful party, see Goodhart, Costs, 38 Yale L.J. 849, 872–78 (1929), we can hardly shut our eyes to this when asked to require the jury to take another extrinsic factor into account—particularly when we know that even court-prescribed maximum scales of contingent fees, which have been attacked by counsel as inadequate, provide either a sliding scale ranging from 50% down to 25% or a flat amount of 33⅓%, N.Y.App.Div. 1st Dept., Special Rules Regulating the Conduct of Attorneys and Counsellors at Law, Rule 4.

There may be cases where failure to make some adjustment for the portion of a plaintiff's or decedent's earnings that would have been taken by income taxes would produce an improper result; but these are at the opposite end of the income spectrum from McWeeney's. For example, if a plaintiff or a plaintiff's decedent, had potential earnings of $100,000 a year, more than half of which would have been consumed by income taxes, an award of damages based on gross earnings would be plainly excessive even after taking full account of the countervailing factors we have mentioned.[13] We find it hard to believe that juries would render such a verdict even in the absence of instruction; but in this limited class of cases the court may properly give some charge or, perhaps better, use the tools provided by Fed.R.Civ.Proc. 49, and an excessive verdict may always be set aside. In such cases, which in proportion are relatively few, the criticism that the whole process of computa-

10. We have omitted mention of a third possible factor, namely, that juries do not usually award the full amount that the earning power $\times$ expectancy—discount formula would demand. See Kalven, supra, note 4, at 161–62.

11. Hence the demand for variable annuities. See S. E. C. v. Variable Annuity Co., 1959, 359 U.S. 65, 70, 100, 79 S.Ct. 618, 3 L.Ed.2d 640.

12. In fact, the annual rate of depreciation of the dollar (compounded) from 1949 to 1959, measured by reciprocals of official cost-of-living or consumer price indexes, was 2.0%. Even for 1954–59 it has been 1.7%. The First National City Bank of New York, Monthly Letter, July, 1960.

13. The decision of the House of Lords in British Transport Commission v. Gourley, (1956) A.C. 185, was such a case. The plaintiff was 69 years old at the date of the trial. The award for loss of earnings was £37,720, which the tax deduction reduced to £6,695. The case had been tried to a judge. Although the House of Lords contemplated application of the principle also in jury trials, as a practical matter the English courts have accomplished "the virtual abolition of the jury system in all civil actions which are not concerned with the personal reputation of the litigants." Goodhart, Current Judicial Reform in England, 27 N.Y.U.L.Rev. 395, 407 (1952). And, of course, the successful plaintiff in England recovers from the loser all reasonable costs.

tion is unrealistic has a considerable measure of validity, the projection of future income at such levels being itself extremely conjectural, and the slope of the tax progression curve declines although only after having reached such a high plateau that earnings above it have relatively slight value. Such cases are in sharp contrast to the great mass of litigation at the lower or middle reach of the income scale, where future income is fairly predictable, added exemptions or deductions drastically affect the tax and, for the reasons indicated, the plaintiff is almost certain to be undercompensated for loss of earning power in any event. To be sure a practice of refusing the instruction in most cases but requiring some adjustment in a few lacks precision and elegance; but we cannot disregard the practicalities of judicial administration and "the law is untidy as life with which it deals."[14] Just where the line should be drawn must be left, as so much is, to the good sense of trial judges, whether acting with a jury or without. Certainly the line was not approached here.

We do not consider that O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 584–585, commits us to the course sought by defendant. O'Connor was an action under the Federal Tort Claims Act by a widow to recover for the loss sustained by herself and a minor child from the death of her husband. Plaintiff's rights were governed by Oklahoma law. The government argued that "Oklahoma has thus joined the jurisdictions which hold that, if damages are supposed to be of a purely compensatory nature, they must be based upon the net earnings of the decedent, his take home pay," citing Magnolia Petroleum Co. v. Sutton, 1953, 208 Okl. 488, 497, 257 P.2d 307, 316; and the Court agreed. Although our much cited decision in Stokes v. United States, 2 Cir., 1944, 144 F.2d 82, 87, denying a

deduction for income taxes in an action against the United States under the Suits in Admiralty Act, 46 U.S.C. § 742, as "too conjectural," was discussed in both briefs in O'Connor, the Court did not overrule it. We continue to adhere to Stokes where the question is one of federal law or the applicable state law is silent, subject only to the qualification stated in the preceding paragraph.

## II.

■ Request No. 17, which Judge Weinfeld also declined to give, was to instruct the jury not to "add any sum of money to the amount of the verdict on account of federal or state income taxes, since the amount awarded to the plaintiff by your verdict is not taxable income to the plaintiff within the meaning of these tax laws." This correctly states the law, Int.Rev.Code of 1954, § 104; N.Y.Tax Law, § 359(2) (e). Unlike Request No. 18, it imposes no new burdens on the jury and there is nothing speculative about it. Hence there would have been no error in the court's giving the instruction. The question before us is not that but whether the failure to give it was error, and error so serious as to require a new trial.

■ We do not think so. The requested instruction was that the jury should not add something to the recovery because of a factor for which the plaintiff had never suggested it should. Before an appellate court should hold that failure to give such a cautionary instruction was reversible error, there ought to be evidence either that juries in general increase recoveries on this account or that the particular jury did so. The published material on the former point is too slender to support a judgment that juries do this generally,[15] and there is nothing to suggest that this one did. McWeeney had incurred medical expenses of $10,305 (only $2,065 of which was challenged

---

14. Felix Frankfurter Reminisces (1960), p. 21.

15. Kalven, A Report on the Jury Project, Conference on the Aims and Methods of Legal Research, University of Michigan Law School, 167–68 (1957).

in any way), had sustained and would sustain pain and suffering, had lost some $14,000 in earnings up to the date of the trial, and had a future earning potential which, discounted on the basis that the judge charged without objection, was nearly $100,000. Under these circumstances, a verdict of $87,000 affords no indication that the jury included an allowance for income tax that McWeeney would never have to pay. To be sure, one may speculate that the jury may have found McWeeney guilty of contributory negligence or may not have believed his testimony as to total disability, and therefore first reduced the amount and then increased it for the non-existent income tax liability; but this is sheer conjecture and no such claim was advanced in support of defendant's motion for a new trial. The accident occurred over four years ago; the case was tried before an experienced judge of the most scrupulous fairness; and we see no sufficient reason for ordering a new trial because he declined to give a cautionary instruction when there is nothing to indicate that one was needed.

Judgment affirmed.

WATERMAN, Circuit Judge (concurring).

In this particular case it is clear that the defendant was in no way prejudiced by the failure of the trial court to charge as requested.

Therefore, I concur in the result reached by Judges CLARK and FRIENDLY.

MOORE, Circuit Judge.

I concur with Chief Judge LUMBARD as to Request No. 17 and with Judge FRIENDLY as to Request No. 18.

LUMBARD, Chief Judge (dissenting).

I would reverse the judgment because of the refusal of the trial judge to charge Request No. 17 which was designed to advise the jury that any sum awarded the plaintiff is not subject to tax.

The purpose of damages is to compensate the plaintiff for losses which he has suffered to the time of trial and may reasonably be expected to suffer in the future. The plaintiff is entitled to have the jury instructed as to every item of loss, which includes reasonable medical expenses, loss of earnings past and future and pain and suffering past and future. On the other hand, the defendant, who must pay the damages, is entitled to have the jury instructed in such wise that it will make its calculations in the light of a proper understanding of what the plaintiff should receive in order to make him whole. The plaintiff should receive no more than that at the defendant's expense. The defendant is entitled to a charge which will direct the jury's attention to every item and consideration which may substantially reduce the plaintiff's loss so that the jury does not charge the defendant with a loss which the plaintiff would never have to suffer. Even handed justice requires nothing less than this.

As to Request 17, Judge FRIENDLY concedes that it would not be error to instruct the jury that the award is not taxable. Internal Revenue Code of 1954, § 104(a) (2); New York Tax Law § 359(2) (e). Even so Judge FRIENDLY says that it was not error to refuse the request inasmuch as there is nothing to show that this jury improperly gave weight to this factor.

Of course we seldom, if ever, know what factors jurors have considered in arriving at a verdict. It is hornbook law that courts will not inquire into what factors jurors have or have not considered, even mistakenly; nor will verdicts be set aside even if it be established that the jurors rendered a verdict for mistaken reasons. The best we can do is to face the realities and require the trial judge to charge upon those matters regarding which misinformation by any one juror might lead the jury to give improper weight to a factor which should not be considered at all. Whatever is to be done must be done before the jury

returns its verdict as it cannot be done later.

In my opinion it is likely that many jurors, without such an instruction as 17, would believe that damage awards are taxable and would weigh this factor against the defendant. In the past few years the public press has carried many reports of large sums won on television quiz programs or in lotteries and sweepstakes. These accounts almost always point out that a very large percentage of the winnings must be paid to the government as income tax. It would be natural enough for the layman to conclude that the plaintiff's receipts from the judgment would be taxed. The only way that the trial court can protect a defendant against a verdict, unduly inflated to take care of taxes in whole or in part, is to charge as requested in 17.

Request 17 is simple and is easily understood. It requires no calculation or computation. The request should have been granted; it was error for the court not to charge the jury that any sum awarded the plaintiff was not subject to taxes. I would grant a retrial and accordingly I pass to the consideration of Request 18 which I think should also be granted, where some basis for it has been presented. I agree that on the state of the record the trial judge properly refused the request 18 because the record does not show what, if any, income taxes were paid by the plaintiff or what would be paid on the plaintiff's income at the rate of $4,800 per annum. But as I would reverse for failure to charge 17, I would also direct upon a retrial that Request 18 should be granted if the defendant offers some evidence as to what taxes the plaintiff actually paid in the past, or what taxes would normally be paid by someone in the plaintiff's situation, i. e. by a bachelor with no dependents.

The majority opinion rests principally on the ground that a jury needs to consider only a few factors in returning a verdict for damages in personal injury actions and these are listed as being "future normal earning power, expect-ancy, and discount factor." The opinion then goes on to argue that in order for the jury to consider the income tax factor considerable additional evidence would be required at trial and the jury would be faced with complex computations and the evaluation of many unpredictable variables. I disagree.

In my view Judge FRIENDLY greatly overestimates the task which the jury would be called on to perform. As his own opinion points out, all that the defendant needed to do in this case was to take the rate of earnings of the plaintiff—$4,800 a year—and compute the taxes which a bachelor with no dependents would pay on the simple tax form, namely $773. The proposed instruction would merely require the jury to estimate loss of future income on the basis of McWeeney's net income of approximately $4,000 rather than upon his gross income of $4,800.

It is beside the point to conjure up, as Judge FRIENDLY does, all the additional complicating factors which might arise. As to the plaintiff, McWeeney, a bachelor at 39, there is no evidence of any dependents or of any deductions or of any other income or of any possible change with respect to any of these items in the future. Indeed it would be the exceptional case where any evidence would or could be offered as to the future. All that the jury usually has before it in the great majority of accident cases, is a record of the plaintiff's earnings for a few years and a record of the tax paid or withheld. As all considerations about the future can be nothing more than a guess, it is simply a matter of guessing the income variable after taxes instead of guessing the gross income before taxes.

On the facts of this case one thing is certain and that is that McWeeney never has escaped and never could expect to escape the payment of income taxes on any money which he has earned or would earn in the future. He has not lost $4,800 in the three years between the injury and the trial as Judge FRIENDLY suggests when he uses the figure of $14,000. He has in reality lost

only $12,000 and the jury ought to be instructed to consider only this actual loss.

It follows that the same measure must accompany and govern the jury's speculation as to future income. Nothing can be more certain than that there will be a federal income tax in the years to come and that it will be substantially what it is now and what it has been for many years. Income taxes are now as much a part of what the prudent man must expect to suffer as are real estate taxes.

The three items of damage which Judge FRIENDLY lists are all speculative in their nature, but it would surely be unfair to omit any one of them merely for that reason. Future normal earning power, expectancy and the discount factor are all sheer speculation so far as applying them to any plaintiff is concerned. But they are the most reasonable measures we have about what is likely to occur in the future.

Life expectancy and the discount factor may also change, just as the tax rate may change. It does not seem to me to overburden the jury to ask it merely to subtract one figure from another to get net income, an operation which counsel can perform and which the court can repeat by way of illustration from what may be in the record.

We held recently in O'Connor v. United States, 1959, 269 F.2d 578, that a judge sitting without a jury in a Federal Tort Claims Act case must deduct income taxes in computing loss of future earnings. There is no reason why there should be a different rule for jury cases. Jurors are as sophisticated about income taxes as are judges; they are just as able to make an estimate of what the taxes would be on the future earnings which they are asked to find that the plaintiff would have made had it not been for the accident. Our earlier decision in Stokes v. United States, 2 Cir., 1944, 144 F.2d 82, 87, is not persuasive authority to the contrary. The question received only casual treatment in the briefs and was disposed of in one brief sentence by Judge Frank who said merely that "such deductions are too conjectural." We are much more certain of the continuance of federal income taxes in 1960 than we were in 1944. In our own circuit Connecticut has recognized the charge as proper. Floyd v. Fruit Industries, 1957, 144 Conn. 659, 136 A.2d 918, 63 A.L.R.2d 1393. There is a full discussion by Morris and Nordstrom in Personal Injury Recoveries and the Federal Income Tax Law, 46 A.B.A.Journal 274, in which the authors develop the arguments in favor of giving charges such as 17 and 18. See also Harper & James, The Law of Torts, § 25.12.

Of course we are apt to talk glibly of the jury's complex computations when we know full well that the give and take of the jury room is in round figures and does not deal in actuarial tables, decimal points and percentages. So in this case, Judge Weinfeld charged in general terms about discounting the money which the jury might award for future loss. His instructions really amounted to no more than saying that the amount awarded now should be considerably less than the multiplication of lost earnings by a certain number of years of expectancy.

Nor do any of the additional factors which Judge FRIENDLY throws into the scales merit serious consideration. His opinion says there are at least two factors which tend to reduce the actual values of verdicts given plaintiffs—inflation and the fact that the plaintiff must pay a reasonable percentage of the recovery to his attorney.

As to inflation, what tomorrow's values will do with today's dollar can hardly be argued to be more harmful to plaintiffs than to defendants. We can only deal in today's dollar. On any other basis any trial would soon be out of hand with only the sky as the limit. Defendants too must live with inflation, be they railroads or individuals; indeed railroads seem to have even more difficulty with inflation than do individuals. A plaintiff receiving a large amount will invest the money in all likelihood in such a manner that he

will have some protection against both inflation and deflation.

Judge FRIENDLY'S second suggestion is also a matter the consequence of which should not in fairness be visited upon a defendant under our present view that each party must pay his own attorney. It is true that contingent fees are the rule in these cases and plaintiffs consequently must forego a considerable percentage of the recovery. It is also true that a system which would charge the losing party with the real costs of litigation, including attorneys' fees, has much to be said for it including the fact that under such a system fees would be more reasonable. But we should not excuse our failure properly to evaluate a major claim of future loss because of some factor for which the defendant is not responsible and over which he has no control.

In any event, Judge FRIENDLY concedes, as he must, that there may be cases involving plaintiffs of large potential earnings where failure to consider the income tax factor would produce an improper result. I submit that if the factor is relevant in any case it is relevant in every case. It can hardly be seriously argued that an item of $773 over McWeeney's life expectancy of 29 years, or about $22,000 before discount, is so insubstantial that a trial court may choose to disregard it.

In summary, it seems to me that it is manifestly unfair to a defendant to ignore the substantial item of income tax payments on future income. A minimum of 15% to 20% of an individual's gross income is generally paid in income taxes. The percentage is often much higher. In most cases the factor of income tax payments on future earnings would be more subtantial than medical bills and other incidental expenses. It is grossly unfair to defendants to deny an instruction as to future income taxes when such instruction is requested and the record contains evidence as to taxes.

I would reverse and remand for a new trial with directions to charge 17 and 18 at the new trial.