Thomas HOOKS, a minor, by Harlin Hooks, his father and next friend, Harlin Hooks and Mildred Hooks

v.

WASHINGTON SHERATON CORPORA- TION, a corporation, I. T. T. Sheraton Corporation of America, a corporation, Appellants, Paddock Swimming Pool Company et al.

No. 76–1958.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 27, 1977.

Decided Dec. 22, 1977.

Rehearing Denied Jan. 17, 1978.

John P. Arness, Washington, D.C., with whom Allen R. Snyder, Washington, D.C., was on the brief for appellants.

Rex Carr, East St. Louis, Ill., for appel- lees, Hooks.

Charles E. Channing, Jr., Upper Marl- boro, Md., also entered an appearance for appellants.

Morton J. Frome, Washington, D.C., also entered an appearance for appellees, Hooks.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This diversity case arose out of the injuries suffered by 18-year old Thomas Hooks when he dove from the three-meter diving board at the Sheraton Park Hotel in Washington, D.C., in June 1971. The pool was equipped with a high performance aluminum "Duraflex" board that propelled Hooks, who was not an experienced diver, into shallow water where he struck his head on the bottom. As a result Hooks is a quadriplegic. Hooks and his parents sued the operator of the pool, the Washington Sheraton Corporation (hereafter Sheraton) and its parent, ITT, alleging negligence in the construction and operation of the pool.[1] Specifically, plaintiffs alleged that the depth of the water in the diving area of the pool did not comply with applicable District of Columbia regulations and that it was too shallow for a three-meter Duraflex diving board.

The District Court held a bifurcated trial on the issues of liability and damages. The jury found Sheraton liable to the plaintiffs and awarded $6,000,000 to Thomas Hooks and $1,000,000 to his parents. On motion by Sheraton the District Court ordered a new trial on the issue of damages unless plaintiffs filed remittiturs of the amounts exceeding $4,500,000 and $180,000 respectively. Plaintiffs filed the remittiturs.

In its appeal from the finding of liability Sheraton contends that the District Court improperly instructed the jury on the standard of care owed by hotelkeepers to their guests, and on the issue of negligence *per se*. Sheraton also contends that the damages awarded to Thomas Hooks are grossly excessive for three reasons: (1) the inclusion of evidence of the effect of inflation on

Hooks' future expenses; (2) the exclusion of evidence of the impact of income taxes upon Hooks' future earnings; and (3) the closing argument by plaintiffs' counsel, which Sheraton says was inflammatory.

We conclude that only one of Sheraton's complaints is valid: the evidence concerning income taxes should have been received. Nevertheless, for reasons hereinafter stated, we affirm the judgment.

## I. LIABILITY

Sheraton contends that the District Court improperly instructed the jury on a hotelkeeper's duty of care, that contrary to the law of the District of Columbia the instruction required Sheraton to give what Sheraton calls an "absolute warranty of safety" to its guests. Sheraton cites *Bellevue v. Haslup*, 80 U.S.App.D.C. 181, 182, 150 F.2d 160, 161 (1945) (Per Curiam); *Picking v. Carbonaro*, 178 A.2d 428, 429 (D.C.C.A. 1962). Appellees argue that the doctrine of implied warranty is now the law of the District of Columbia. Whether the *Bellevue* decision remains the law of the District of Columbia is an issue we need not reach because read in context the instruction here is not a warranty charge.

The District Court began its instructions on the issue of negligence by properly instructing the jury that

. . . the owner of a hotel is liable for failure to use reasonable care to keep safe such parts of the premises as he may retain under his control either for his own use or for the common use of the guests or tenants of the hotel.

*It is the duty of the tenants or guests to exercise ordinary care for their own safety. In other words, the owner of a hotel is not an insurer of the safety of his guests, but he does owe to them the duty to exercise reasonable care for their safety.*

[Emphasis added]

The court then proceeded to instruct the jury on the general law of negligence, neg-

---

1. The builder of the pool, Paddock Corporation, was joined as a third party defendant by Shera-

ton but the jury absolved Paddock of any responsibility for the accident.

ligence *per se*, contributory negligence, and assumption of risk. The court's reference to warranty came in the context of the instruction on assumption of risk.

Before this rule [assumption of risk] is applied to defeat the plaintiff's claim, however, you must be satisfied by a preponderance of the evidence that the danger or hazard which caused the injuries of the plaintiff was open and apparent, that he was aware of it, or that in the exercise of reasonable care should have been aware of it, and that he voluntarily exposed or subjected himself to whatever hazard or danger might reasonably have been involved.

*You are instructed that the owner or the operator of a hotel warrants to its patrons that the facilities of said hotel are safe for the use by its patrons, free from defects and dangerous designs, and that such facilities can be used in the use and manner for which they were intended without danger or risk of injury and that such facilities are reasonably fit and suitable for their intended use.*

When a patron of such a hotel uses such facilities in the manner and method they were intended to be used, he does not assume the risk of injury and is not chargeable with contributory negligence if he sustains an injury in so doing.

[Emphasis added]

It is apparent from the language before and after the sentence relating to warranty that in this sentence the court was explaining to the jury that when using the defendant's pool in the manner for which it was intended, Thomas Hooks did not assume the risk of injury from defects or dangerous design, of which he was not aware, and that he was entitled to rely on the hotel's representation that there were no such hidden perils. We think the jury could not have understood the one sentence, delivered in the course of seven pages dealing with negligence, to mean that the hotel owed an "absolute warranty of safety" to its guests. This we think is plain in light of the clear statement at the outset, that the hotel is not an insurer and that it owes its guests a duty of reasonable care. Accordingly we reject the argument that the instruction improperly imposed upon Sheraton a duty to give its guests an absolute warranty of safety.

■ Sheraton also contends that the District Court erred in instructing the jury on the issue of negligence *per se* because Sheraton had explained that any possible violations of the applicable District of Columbia regulations were consistent with due care. At trial Hooks offered evidence from which the jury could conclude that the pool failed to meet District of Columbia regulations concerning the depth of water required to be directly under as well as extending out from the end of the three-meter diving board.

Paddock, the third party defendant, introduced evidence on the dimensions of the pool, which showed that there might have been minor violations of the regulations.[2] In an effort to explain any violations, Sheraton called Mr. Brink, the chief of the District of Columbia Bureau of Air and Water Quality, to testify that the plans for the pool had been approved by his Bureau.

In *H.R.H. Construction Corp. v. Conroy*, 134 U.S.App.D.C. 7, 411 F.2d 722 (1969), this court drew a distinction between cases in which the defendant offers no explanation of a violation of a statute or regulation[3]

| 2. | Distance from end of Diving Board | Depth (Paddock) | Depth (Hooks) | Depth (D.C. Regulation) |
|---|---|---|---|---|
| | 0' | 10' 5" | — | 10' 0" |
| | 12' | 9' 10½" | 9' 7³/₁₆" | 10' 0" |
| | 14' | 9' 3⅞" | 9' 0" | 9' 4" |
| | 15' | 9' 0" | 8' 8³/₁₆" | 9' 0" |
| | 17' | 8' 5" | 8'1³/₁₆" | 8' 3⁵/₈" |

(Sheraton Brief at 5)

3. *See, e. g., Ross v. Hartman*, 78 U.S.App.D.C. 217, 139 F.2d 14 (1943), *cert. denied*, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1944); *Richardson v. Gregory*, 108 U.S.App.D.C. 263, 281 F.2d 626 (1960).

and those in which the defendant introduces evidence tending to show that its failure to comply with the statute or regulation is consistent with the exercise of due care.[4] The instruction on negligence *per se* is proper only when no explanation is made. 134 U.S.App.D.C. at 9, 411 F.2d at 724. Sheraton urges us to hold that its evidence of the approval of the plans, the custom of inspection during construction, and the issuance of the operating license for the pool was enough to negative the inference of negligence *per se.* We disagree.

Mr. Brink testified that he personally approved the plans for the pool in 1960. He also testified that it is the custom for inspectors to check compliance during construction, and that a license to operate the pool would not have issued unless the pool had been built according to the plans. Mr. Brink did not testify from personal knowledge that the pool was so constructed, nor did anyone else. As it turned out, the pool was not so constructed. The approved plans called for a wooden diving board. In 1968 Sheraton replaced the original board with a high performance aluminum "Duraflex" board. Several experts, including the 1976 U.S. Olympic diving coach, testified that this type of board at the three-meter height is unsafe for the inexperienced divers likely to use a hotel pool. A college diving coach said that a Duraflex board "has a great deal more of elasticity and projects people higher in the air. . . . [I]f a person's balance is forward at the time [he leaves] that board, it's going to send him a lot farther out." Moreover, the aluminum board extended five inches farther into the pool than the original wooden board. This seems at first a small modification, but it is of particular importance to the question whether the pool depths violated District of Columbia regulations. The regulations require ten feet of water direct-

ly under the board and extending out from it for twelve feet. Thereafter the bottom may incline toward the surface at a rate of one foot of depth for every three feet of distance from the board. Obviously as the board extends farther over the water, the distance from the end of the board to the point where the bottom inclines toward the surface is reduced. The area where the bottom slopes up is where the injury occurred. Finally, plaintiffs introduced evidence that on the day of the accident, the pool's water level was several inches low. This too would reduce the depth of the water under and out from the diving board. There was no showing that the District of Columbia approved these deviations from the plans approved by Mr. Brink in 1960.[5] We conclude, therefore, that the negligence *per se* instruction given here was proper under the circumstances.

## II. DAMAGES

On the question of damages Sheraton contends that the jury award was so grossly excessive that it indicates a "runaway" jury motivated by passion and prejudice. The remittiturs, argues Sheraton, were insufficient to remedy the problem. Specifically, Sheraton objects to the admission of evidence of estimated future inflation, to an allegedly inflammatory closing argument, and to the exclusion of evidence of the effect of income taxes upon Thomas Hooks' future earnings.

■ We note at the outset that the District Court has broad discretion to order a remittitur in lieu of a new trial and we find no abuse of that discretion here. *See H.R.H. Construction Corp. v. Conroy, supra,* 134 U.S.App.D.C. 7, 8, & n.1, 411 F.2d 722, 723, & n.1 (1969). With respect to Sheraton's specific allegations of error, two are

---

4. *See, e. g., Hecht Co. v. McLaughlin,* 93 U.S. App.D.C. 382, 214 F.2d 212 (1954); *Karlow v. Fitzgerald,* 110 U.S.App.D.C. 9, 288 F.2d 411 (1961).

5. Sheraton contends that semi-annual inspections were carried out after the operating license issued and after the board had been changed. However, these inspections appear to have been limited to testing water quality and could not explain any violation resulting from the change in the diving board.

not properly before this court. Appellants conceded at oral argument that the issue of inflation had not been raised in the District Court; therefore it will not be considered here. Similarly, the objection to counsel's closing argument is not properly before us. Sheraton first raised this objection in its motion for a new trial, too late to preserve the point. *See McWilliams v. Lewis*, 75 U.S.App.D.C. 153, 154, & n.4, 125 F.2d 200, 201, & n.4 (1941); *Christian v. Hertz Corp.*, 313 F.2d 174, 175 (7th Cir. 1963); *Hobart v. O'Brien*, 243 F.2d 735, 741–42 (1st Cir.), *cert. denied*, 355 U.S. 830, 78 S.Ct. 42, 2 L.Ed.2d 42 (1957). We have reviewed the arguments in question and find no basis for treating them as plain error.

■ Sheraton's third contention with respect to damages is more troublesome. The District Court permitted Sheraton to cross examine plaintiffs' expert economist and statistician on the effect of income taxes upon Thomas Hooks' lost future earnings. In a subsequent ruling on plaintiffs' objection to this line of questioning, however, the court ordered the testimony stricken and admonished the jury to disregard it.

In *Runyon v. District of Columbia*, 150 U.S.App.D.C. 228, 231, 463 F.2d 1319, 1322 (1972), we held that in determining a decedent's projected future earnings probable income taxes are to be deducted. Hooks attempts to distinguish the *Runyon* case upon the ground that it was a death case in which the jury could award only the amount available to the estate after deducting taxes and the costs of maintenance of the decedent and his dependents. We are unable to perceive any distinction between death cases and personal injury cases in computing lost future earnings. In both situations the compensation is for future earnings lost as a result of a defendant's tortious act. That the estate in a death case receives only a net amount after taxes and expenses are deducted whereas the personal injury plaintiff is himself being compensated for his lost future earnings is a distinction without legal significance. "The primary aim in measuring damages is compensation, and this contemplates that the damages for a tort should place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred . . . ." C. McCormick, Law of Damages 560 (1935).

Both sides rely on the Second Circuit's *en banc* decision in *McWeeney v. New York, N. H. & H. R. R.*, 282 F.2d 34 (2d Cir.), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960). In the *McWeeney* case the Second Circuit concluded that juries should not be instructed to consider the effect of income taxes in determining awards for middle to low income plaintiffs.[6] The court reasoned that determination of future tax liability would be too speculative and confusing to the jury, and that countervailing factors of inflation and attorneys' fees reduce the recovery and offset the failure to consider taxes. 282 F.2d at 36–38. We are not persuaded by these reasons.

The existence of income taxes is hardly more speculative than is the assumption, indulged here, that Thomas Hooks would attain his dream of being a Boy Scout executive and that he would continue in that employment for forty years at ever increasing salaries. *See* n.7 *infra*. To allow a plaintiff to attempt to prove what he would have earned yet to shut off as too speculative the defendant's attempt to show what he would have been taxed is in our opinion unjust. The second factor cited by the Second Circuit, jury confusion, is a more weighty consideration; but we think expert testimony, presented under the watchful eye of the experienced trial court, *see Fed. R.Evid.* 403, can reduce confusion to a minimum. Moreover, expert testimony will avoid the possibility of a tax-conscious jury attempting to include in its award its own uninformed allowance for income taxes.

---

6. The court suggested that income taxes might be considered properly in cases of high income plaintiffs. 282 F.2d at 38. Subsequent decisions have followed this suggestion. *LeRoy v. Sabena Belgian World Airways*, 344 F.2d 266, 276 (2d Cir.), *cert. denied*, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965); *see Petition of Marina Mercante Nicaraguense S. A.*, 364 F.2d 118, 126 (2d Cir. 1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967).

The third consideration, that excluding evidence of taxes offsets the effects of inflation and attorneys' fees, has no application here. Hooks presented extensive evidence on the effects of future inflation. As for attorneys' fees, they are typically borne by the parties. If we are to depart from this rule, it should be a step taken consciously by the legislature, not one blended into a judicial opinion under the guise of excluding tax evidence to offset plaintiff's need to compensate his attorney.

We are told by plaintiffs that in holding that income taxes should be considered we part company with the considered opinions of the vast majority of jurisdictions which have followed the *McWeeney* case. We question whether this is so, for Thomas Hooks would probably qualify as a high income plaintiff under the *McWeeney* rule, see n.6 *supra*. We note too that support for the *McWeeney* rule has begun to erode. *See Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 288–94 (9th Cir. 1975), applying the "high income" exception; *Felder v. United States*, 543 F.2d 657, 665 (9th Cir. 1976).

We conclude that evidence of probable income taxes on lost future earnings should have been admitted.

The question remains whether a new trial on the issue of damages is required by our holding. For the reasons set forth below, we believe that the remittitur already filed by Thomas Hooks in the amount of $1,500,000 more than compensates for any error in excluding evidence of the effect of income taxes.

Plaintiffs' expert on economics and statistics, Dr. Miller, testified as to Thomas Hooks' potential future earnings. Using alternative career patterns, Dr. Miller estimated Thomas Hooks' potential lifetime earnings, assuming a 40-year work life and a salary growth rate of 4.5 percent. These totals were discounted to present value assuming investment at seven percent. Sheraton did not offer any testimony on Hooks' probable earnings. Sheraton did however cross examine Dr. Miller on the effects of income taxes on the various lifetime earnings that he had projected. Dr. Miller computed the taxes on the witness stand, assuming that with a standard deduction and one personal exemption Thomas Hooks would pay 20 percent of his gross income in taxes. The estimate of taxes ranges from $70,000 to $225,000.[7]

Sheraton points out, correctly, that for some of his hypothetical careers Thomas Hooks would be in a much higher tax bracket than the 20 percent used by Dr. Miller. With a general verdict we cannot know which potential income the jury decided Hooks would have realized. But a new trial is unnecessary because the trial court has already required and Hooks has accepted a $1,500,000 remittitur. Treating every variable most favorably to Sheraton, we assume that the jury believed Hooks would have had a career as a $40,000 Boy Scout executive and we further assume that Sheraton could have demonstrated conclusively that the tax rate would have been 40 percent. This would result in only $450,000 in taxes, see n.7 *supra*, less than one third of the amount already remitted by Thomas Hooks.

We have no doubt that we have the power to order a further remittitur as a condi-

7.

| Hypothetical Career | Present Value of Life Earnings | Tax (20%) |
|---|---|---|
| High School Graduate | $ 352,000 | $ 70,000 |
| Two Years College | 402,000 | 81,000 |
| College Graduate | 536,844 | 107,844 |
| Boy Scout executive ($25,000/yr.) | 700,000 | 140,000 |
| Boy Scout executive ($40,000/yr.) | 1,125,348 | [225,000] |

Tr. 53, 87–88, 90, 104 (5/22/75) The $225,000 was not testified to by Dr. Miller but represents 20 percent of the $1,125,348 earnings for a Boy Scout executive averaging $40,000 per year over his lifetime.

tion of affirmance, 28 U.S.C. § 2106; *Felder v. United States*, 543 F.2d 657, 671 (9th Cir. 1976); *Lanfranconi v. Tidewater Oil Co.*, 376 F.2d 91, 96–97 (2d Cir.), *cert. denied*, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Boyle v. Bond*, 88 U.S.App.D.C. 178, 179, 187 F.2d 362, 363 (1951) but we are persuaded that the remittitur below is sufficient. It reduced the jury verdict by 25 percent and was more than three times the maximum amount assignable to the trial court's error. The District Court arrived at an amount of recovery which it found in conformity with the interests of justice. We are not inclined to upset that conclusion.

*The Judgment is Affirmed.*