MAGNOLIA PETROLEUM CO. et al. v. SUTTON.

No. 35224.   April 21, 1953.

Rehearing Denied May 19, 1953.

*257 P. 2d 307.*

Earl A. Brown, Dallas, Tex., and Robert W. Richards, Oklahoma City, for plaintiffs in error.

Gomer Smith and Gomer Smith, Jr., Oklahoma City, for defendant in error.

BLACKBIRD, J. In this action, defendant in error, as plaintiff, obtained a verdict and judgment against plaintiffs in error, as defendants, in the sum of $70,000 for the alleged wrongful death of her husband, Buster Sutton, in an explosion on an oil and gas lease.

The lease belonged to one of the plaintiffs in error, Magnolia Petroleum Company, and Sutton was the employee of Monarch Construction Company, which was engaged under contract with said oil company, to install a battery of four oil field storage tanks on the lease. The tanks were erected in a single file or straight row.

The explosion killed Sutton instantly. Its cause was unknown and how it occurred remained the principal issue throughout the trial. There were various theories, testified to by expert as well as nonexpert witnesses, as to what might have caused it.

It appears that on Saturday, October 16, 1948, or two days before the fatal accident, Sutton, and Monarch's foreman, Charles Leffler, did some work on the tanks, but did not connect the two north tanks referred to herein as tanks Nos. 1 and 2 with the two south tanks referred to as tanks Nos. 3 and 4. While they were there that day, Hoenig Tank Trucks, another independent contractor, hauled in several hundred barrels of crude oil for Magnolia and

pumped the oil into tanks 1 and 2. After that, apparently all workmen left the the tank battery until the following Monday, when the Monarch workmen, including the deceased, and his foreman, Leffler, returned to complete their part of the tank battery installation. Their arrival preceded that of a crew employed by Magnolia Pipe Line Company, whose job was to connect each tank in the battery with said company's pipe line. The latter crew and the Monarch workmen had labored two hours or more there together on their separate assignments in connection with readying the tank battery for operation when the explosion occurred.

At the time of the explosion, the pipe line which was to conduct the future crude oil contents from the tanks for marketing, or other uses, was already laying in a shallow open ditch alongside the tank battery and a welder of the pipe line company's crew was engaged in cutting or shortening with an acetylene torch a "riser" pipe, coming up out of this line to connect it with what we will call a "spigot", near the base of tank No. 3. The deceased had been sent to the topside of the tank battery to lubricate the stops or valves on the equalizer or "overflow" pipe or line, which extended between the tanks near their tops, and was for the purpose of permitting oil to flow over from one tank into the next one when the adjoining one was filled to capacity. He was lubricating the "stop" valve on the overflow line between tanks 3 and 4.

The explosion blew down only tank 4, but the impact also unseated tank 3. The other two tanks were apparently not affected. The testimony is not in agreement as to whether tanks 3 and 4 were affected simultaneously or successively; and, if successively, which tank —No. 3 or No. 4—felt the impact first.

When this action by Sutton's widow came on for trial before a jury, not only the Magnolia Petroleum Company and the Magnolia Pipe Line Company but also Monarch Construction Company, its foreman, Charles Leffler, and

Hoenig Tank Trucks were parties defendant.

After plaintiff had moved for a dismissal of the action as to Hoenig Tank Trucks, the verdict was against only the two defendants, Magnolia Petroleum Company and Magnolia Pipe Line Company, the jury exonerating the other two.

The Magnolia Companies have appealed from the trial court's order overruling their separate motions for a new trial, filed on the ground, among others, that the trial judge erred in overruling the separate requests they made during the closing arguments that a mistrial be declared. Plaintiff and these defendants will hereinafter be referred to by their trial court designations, except when clarity requires use of their proper names. Other defendants will be designated by name.

At the trial, one of the theories advanced as to the cause of the explosion was that gas or combustible fumes from the oil in tanks 1 and 2 were ignited by the acetylene torch the pipe line company's welder was using. Defendants' principal theory was that such fumes were set off or ignited by the negligence of the decedent or one of Monarch's other employees near or on top of tanks 3 and 4. Their counsel now points to such physical facts as the blowing down of tank 4, while tank 3 remained standing, testimony that Monarch workmen were seen smoking within three or four minutes of the explosion, that deceased was a cigarette smoker and bits of cigarettes and matches were observed lying near his body after the explosion, and conclusions of experts, as showing that the ignition of the gases must logically have come from some source closer to tank 4 than the welder working at the base of tank 3.

The defendants' separate requests of the trial judge to declare a mistrial were directed, not at the conduct of Mr. Gomer Smith, plaintiff's attorney, but at the conduct of Mr. Paul who represented their codefendant, the

Monarch foreman, Charles Leffler, and was also one of the attorneys for the Monarch Company, which had an additional attorney, Mr. Brown. The appealing defendants, Magnolia Petroleum and Magnolia Pipe Line, were represented by Mr. Richards and Mr. Garvin. Mr. Paul's conduct is indicated by the following excerpt from his closing argument to the jury:

"* * * The Court has instructed you as a matter of law and as a matter of fact that oil, crude oil is a dangerous thing. We are going to decide just exactly the cause of that explosion out there. I am not going to set a fire here or hurt anyone, you don't have to worry about that. First, tell me if that is gasoline, (handing to the jury a can); I want you and each of you to examine it and tell me if it is gasoline, I am sure each of you say that it is gasoline. I just went down to the filling station and bought one quart of good gasoline, will someone give me a cigarette?"

Following the above remarks, Mr. Richards immediately interposed an objection and made motions on behalf of both of his clients that the court declare a mistrial. The court then excused the jury for the purpose of hearing argument on these motions, and, as the jurors filed out of the courtroom, one of them remarked: "If an explosion takes place who is responsible?" After the jury's departure, Mr. Paul explained to the court that with the can of Ethyl gasoline he had brought out of his brief case during his quoted remarks, he had intended to demonstrate to the jury that an open flame is required to ignite gasoline—that a cigarette will not do it; that he had been about to drop a burning cigarette in the gasoline to show them it would be extinguished rather than igniting the gasoline. He further explained that he had then intended to drop a lighted match in the gasoline showing the jury that the match's flame would ignite it. Mr. Paul's evident intention, as indicated, had been to graphically demonstrate to the jury that the explosion was caused by the flame on the acety-lene torch of Magnolia pipe line's welder, rather than by any burning or smoking cigarettes of the deceased or other Monarch employees. At the conclusion of the attorney's argument, out of the hearing of the jury, the court overruled them, and admonished Mr. Paul to refrain from proceeding with his proposed demonstration to the jury; and when the jurors returned to the courtroom, the judge instructed them to disregard what they may have seen or heard during Mr. Paul's above-quoted opening remarks and told them specifically: "* * * It has nothing to do with this case." Then before resuming his closing argument, Mr. Paul made the following additional remark (whether addressed as a question to the court or a statement to the jury does not definitely appear): "Then I cannot make the demonstration that I desired to make." Mr. Richards then renewed his clients' motions for a mistrial and the court again ruled against him, but instructed the jury to disregard Mr. Paul's last-quoted remark.

Counsel for the Magnolia Companies states that in this case, the defendants Monarch Construction Company and its foreman, Leffler, in reality, were just as much adverse parties to his clients as was the plaintiff, in that if it was successfully demonstrated to the jury that his clients were entirely responsible for the death of the deceased, then they could reasonably expect a verdict relieving them from all liability. The argument is to the effect that the trial judge should have stopped Mr. Paul before he had gone so far with his allegedly wrongful attempt to demonstrate to the jury that the pipe line company's acetylene torch flame, instead of the deceased's or some other Monarch worker's lighted cigarette, caused the explosion; that the jury should have been ushered out of the courtroom before the controversy between lawyers about the demonstration began; and that the court's failure to do either of these things resulted in the jury receiving an unfair, biased

and prejudiced impression of the evidence, and, of the correct conclusion to be drawn therefrom, as to the real cause of the accident. It is argued that the harmful and damaging effect as to the Magnolia Companies, of the unwarranted conduct of Mr. Paul, apparently endorsed by Monarch's other attorney, Mr. Brown, was not wiped out, obliterated, or removed from the minds of the jurors by the court's "mild" admonition, as is indicated by the parting remark of one of the jurors we have quoted. Counsel say they recognize the general rule that the trial court's admonition will usually rectify the harm done by improper remarks by litigants' counsel before a jury, but they say there is a recognized exception to this rule which applies where counsel have gone beyond the record in his argument. They cite the case of City of Shawnee v. Sparks, 26 Okla. 665, 110 P. 884, with excerpts from Bullard v. Boston & M. R. R., 64 N.H. 27, 5 Atl. 838, quoted therein, excerpts from Labbe Mfg. Co. v. Samples, 89 Colo. 333, 2 P. 2d 1086, and Waldron v. Waldron, 156 U.S. 361, 39 L. Ed. 453, as authority for their position. We think all of these cases may be distinguished from the one at bar. The decision on the matter referred to in the Shawnee case is reflected in paragraph 1 of the syllabus therein, as follows:

"Where counsel in argument makes statement of a material fact not in evidence against the objection of the other party, he violates the right of a fair trial, and where the trial judge fails to pass squarely on the objection, and, if sustained, fails to admonish the jury to disregard such statement as not in evidence, we must reverse, unless this court can ascertain from the record that no harm resulted."

In all of the above-cited cases, the attorney's statements complained of unequivocally and definitely represented material facts to the jury that were not in evidence, or they persisted in their statements after being admonished not to make them. As shown in the present case, Mr. Paul made no such representation nor did he persist in attempting to make his planned demonstration. The trial court specifically sustained Magnolia Company's objection to his going any further with it and specifically instructed the jury that what they may have seen or heard during the first part of Mr. Paul's argument had "nothing to do with this case." Of course, there was no evidence in this case that the explosion was caused from the ignition of gasoline—the facts indicated it was the result of the ignition of natural gas or gaseous fumes from crude oil,—but we do not think that, under the circumstances Mr. Paul's interrupted attempt to make the demonstration he had planned was the same or tantamount to the statement of a material fact not in evidence. And, even so, the fact that a flame and not a cigarette ember would ignite gasoline was a matter with which most, if not all, members of the jury, from their own personal experience, reading or observation, were probably already familiar. As noted, the explosive agent in evidence was gas rather than gasoline, but as plaintiff's counsel points out, a demonstration that such explosive agent was ignited by a flame, rather than the live ember of a smoking cigarette, though not entirely irrelevant, could not, in itself, have been decisive. Here, there was ample evidence that it was the welder's flame which furnished the ignition for the explosion. We do not think it appropriate here to act upon speculation as to whether Mr. Paul's remarks influenced the jurors in arriving at their verdict. Defendant's counsel point to nothing indicating that they were, except the amount of the recovery. Their efforts would obviously be more germane to the issue and more competently show harmful effect from Mr. Paul's conduct, if they pointed out an absence of evidentiary basis for culpability on the part of their clients, rather than referring only to the amount the jury determined they should pay for such culpability. We do not think the circumstances justify the application of the extreme measure of holding Mr. Paul's conduct reversible error "unless

this court can ascertain from the record that no harm resulted." Ordinarily, the remarks of counsel in their argument before a jury are not considered reversible error, if ordered stricken by the court or are definitely withdrawn from the jury's consideration, and it does not appear that the jury was influenced thereby. Wagner v. McKernan, 198 Okla. 425, 177 P. 2d 511; Grand River Dam Authority v. Audrain, 193 Okla. 55, 141 P. 2d 97; Sinclair Oil & Gas Co. v. Crane, 175 Okla. 198, 51 P. 2d 711; McDonald v. Cobb, 52 Okla. 581, 153 P. 138. The whole case, with the particular circumstances thereof, may be taken into consideration in determining the effectiveness of attempted corrections by the court, of the error in the improper argument or conduct. Wagner v. McKernan, supra; 3 Am. Jur. 612, §1070. We recognize that in a case where, by highly improper or prejudicial remarks, attorneys have insisted on going beyond their legally permissible latitude in such matters (See Grand River Dam Authority v. Audrian, supra), and the appellate court cannot definitely determine on a concrete and tangible basis whether or not the error has actually resulted in prejudice to the complaining party, it may conclude that the ends of justice would be served only by affording a new trial (See, in this connection and in addition to defendants' cited cases, the discussion in Berry v. Park, 185 Okla. 118, 90 P. 2d 425, and the rule stated in Texas Indemnity Insurance Co. v. McCurry (Tex. Com. App.) 41 S. W. 2d 215, 78 A.L.R. 760). Here, however, we do not believe that such a situation exists and, while attorney Paul's conduct was not proper and is not to be condoned, we do not think his attempted demonstration had progressed so far beyond an attorney's license in such matters (before its interruption and the taking of corrective measures by the court), that we can say, with any degree of certainty, and on the basis of the record, that the jury's verdict would have been different had it not occurred. For this reason, we think the harmless error doctrine rather than the rule urged by defendants applies; and the verdict will not be set aside because of the trial court's alleged error in refusing to declare a mistrial.

Another proposition presented by defendant Magnolia Petroleum Company is that the trial court erred in overruling its separate demurrer to plaintiff's evidence. Under this proposition, it is argued that since the deceased was said oil company's invitee and it owed him no greater degree of care than keeping the premises reasonably safe from defects or conditions in the nature of hidden or concealed dangers or pitfalls, the question presented by said demurrer was whether said company had created such a danger by having crude oil in tanks 1 and 2, and then, having the Monarch crew, of which deceased was a member, connect up the vent, flow and equalizer lines from these tanks to tanks 3 and 4. In support of this argument, they point to the testimony of various witnesses showing a more or less common knowledge among the workmen on the lease, including some of those employed directly by the Monarch Company, that tanks 1 and 2 did contain the crude oil, and they say it is inconceivable that the deceased did not also know of the existence of said oil in those tanks. Plaintiff's counsel find no particular fault with this premise, but they point out that the deceased's knowledge that tanks 1 and 2 contained oil was not the same or tantamount to knowledge that the valve on the vent line between these tanks and tanks 3 and 4 had been opened allowing gas to escape from the former into the latter ones that contained no oil and would reasonably be assumed to be free of oil fumes or gas. We think this sufficiently answers Magnolia Petroleum Company's contention. Here, we find no proof that the deceased knew or should have known that such gases had been allowed to escape into tanks 3 and 4, and at most, this question, under the circumstances, was a part of or related to the one of deceased's contributory negligence, and

494

was a matter for determination by the jury.

Under the above proposition, the Petroleum Company also argues that, assuming its conduct constituted negligence, such negligence merely created a condition rendering the fatal injury possible by the action of "intervening" conduct on the part of the Monarch Company, its foreman, Leffler, the deceased, and Magnolia Pipe Line Company. In this connection, it is said that the Petroleum Company should have been freed from liability because it was these intervening acts of other defendants that combined to cause, and were the proximate cause of the decedent's death; and any negligence on the Petroleum Company's part was too remote from the explosion to be deemed its cause, under the rule promulgated and followed in Fox v. Superior Oil Co., 188 Okla. 165, 107 P. 2d 185; St. Louis & S. F. Ry. Co. v. Gilbert, 185 Okla. 591, 95 P. 2d 123; and Munroe v. Schoenfeld & Hunter Drilling Co., 178 Okla. 149, 61 P. 2d 1045. We cannot agree. As pointed out in plaintiff's brief, the above cases were distinguished from and shown in Magnolia Petroleum Co. v. Barnes, 198 Okla. 406, 179 P. 2d 132, not to be decisive in a case like the present one. In the latter case, this court demonstrated that where there is evidence from which it may reasonably be concluded that a defendant was negligent and the alleged "intervening cause" is not sufficient in itself to produce the injury, defendant's negligence may still be the proximate cause of the injury; that · the "intervening" acts must be the "efficient" cause and such as to sever the connection between defendant's original negligence and the injury, in order to relieve him from the consequences of such negligence. The applicable rule is more fully explained in the following excerpt from City of Altus v. Wise, 193 Okla. 228, 143 P. 2d 128:

" . . . in order to relieve the one guilty of the first act of negligence of reponsibility, the intervening cause must entirely supersede the original negligence. In other words, it must be independent of the original act and adequate of itself to bring about the injurious result. (Citing authorities.) * * * Consequently, where an act of negligence is not superseded by a second cause, but continues to operate, so that the injury is the result of both causes acting in concert, each act may be regarded as the proximate cause thereof.* * *"

In this case, Magnolia Petroleum Company's negligence and responsibility for the dangerous gas condition existing at the time of the explosion was not superseded by the act of the Pipe Line Company's welder, or of any one or more of the Monarch Company's employees, in setting it off or igniting it. Obviously, such flame or spark was harmless and wholly inadequate, in itself, to bring about the explosion. Both the gas and the ignition had to be present. A concurrence of both was necessary to cause the explosion. Therefore, we are not impressed by said company's attempt to relieve itself of liability for its negligence, by showing that another's negligence also contributed to or helped cause the explosion. From a consideration of the evidence as a whole (which must be done since said Petroleum Company did not stand on its demurrer and appeal directly from the ruling thereon) we do not think the trial court erred in overruling said Petroleum Company's demurrer.

The next proposition in defendants' brief is that the trial court erred in overruling Magnolia Pipe Line Company's demurrer to the evidence, and, in this connection, it is contended that there is no basis in the evidence for any liability on the part of this defendant. It is argued on the basis of testimony to the effect that tank 4 exploded before tank 3, and from the fact that said company's welder was working in front of tank 3 instead of tank 4, that the explosion could not have been ignited by the welder's torch. Counsel says that if such had been the case, tank 3 would undoubtedly have

been the first of the two tanks to explode. Defendants' witness, Dr. Huntington, testified to the effect that if tank 4 had been the first of the two tanks to explode, then undoubtedly it was the gas in that tank rather than the gas in tank 3 that was ignited first. As hereinbefore revealed, there was a conflict in the evidence elicited to show which of these tanks exploded first. Consequently, the jury was at liberty to draw its own conclusions as to this, along with the inferences or conclusions to be drawn from all of the other evidence, under proper court instructions. In the absence of any clear or unequivocal showing of error in the jury's verdict that the Pipe Line Company was at least partially responsible for the explosion, we cannot see that such conclusion is an incorrect one from such conflicting evidence. The rule is that verdicts in such cases must be accorded every presumption of correctness on appeal and defendants point to no fact unequivocally established by the evidence, sufficient to overcome such presumption in this case.

In its propositions V and VI, defendants contend that the trial court erred in giving its instructions Nos. 13, 22, 23, 24, and 42. The pertinent parts of these instructions are as hereinafter briefly described and delineated. By the first one, the court described the different degrees of care in law as: slight, ordinary and great; and thereinafter told the jury that it was for them to decide which of such degrees governed defendants' obligations in this case. In the second, they were told that Magnolia Petroleum and Magnolia Pipe Line owed plaintiff's decedent only ordinary care to protect him "against injury and death." In the third, they were told that because of the dangerous character of gas, the law imposes upon those handling it a high degree of care to prevent damage, commensurate with the danger it is their duty to avoid. The court's instruction No. 24 was as follows:

"You are instructed that the deceased, as well as the other employees of the defendant, Monarch Construction Company, were invitees upon the premises where they were connecting and installing the tank battery for said Magnolia Petroleum Company. Said Magnolia Petroleum Company owed the deceased the duty to keep the premises reasonably safe, but the duty to keep the premises reasonably safe applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pit-falls and the like, in that they are not known to the invitee and would not be observed by him in the exercise of ordinary care. In this connection, if you find from the evidence herein that the death of the deceased, Buster Sutton, was the proximate result of a defect or condition which was known to him, or which should have been observed by him in the exercise of ordinary care, then your verdict shall be for the defendant, Magnolia Petroleum Company."

Counsel says that the above instructions were conflicting and confusing as to the degree of care defendants owed the deceased in that the jury was first told it should determine such degree, then told that Magnolia Petroleum Company must have used ordinary care to protect him against "apparently any danger", then that a high degree of care was required, and, finally, that Magnolia Petroleum Company's duty was to keep the premises safe only as to unknown or hidden defects and conditions. We think counsel exaggerates the import and effect of the instructions referred to. When they are considered together, they can readily be correlated into a fair statement of the law. In this case, the different defendants bore various relationships to the decedent, such as employer, invitor, and licenser; and their duties toward deceased varied with their relationships to him, as well as with the instrumentalities they were handling or dealing with in their work on the lease. It would have been exceedingly difficult, if not impossible, to incorporate into any one paragraph

of instructions, a comprehensive and readily understandable statement of the law as to all of the various factors the jury was to take into consideration; and it was not necessary that the court's directions to that body be set forth in that manner. It is sufficient if the various paragraphs or numbered instructions when considered together and, as a whole, fairly present the law applicable to the issues. Johnson v. Short, 204 Okla. 656, 232 P. 2d 944.

The court's instruction No. 42 was as follows:

"You are further instructed that if you find from all the evidence, by a fair preponderance thereof, that the sole proximate cause of the explosion and death of plaintiff's decedent, Buster Sutton, was the act of negligence of defendant, Magnolia Pipe Line Company, if any, through any of its employees, then the defendants, Monarch Construction Company and Charles Leffler would not be liable in this case, and your verdict should be in their favor."

Counsel charges that the above instruction was erroneous in so far as Magnolia Petroleum Company was concerned, because it did not include said company with the other two defendants in whose favor a verdict should be returned, if decedent's death was found to have been caused solely by the negligence of the Pipe Line Company. The record reveals that the court had already told the jury, by instruction No. 26, that the Petroleum Company and the Pipe Line Company were two separate and distinct legal entities, and in instruction No. 40 had also told the jury that before plaintiff was entitled to recover against the Petroleum Company, she must establish that it was negligent and that such negligence was either the direct and proximate cause of the deceased's death in itself, or combined with the negligence of another defendant, to cause it. When this instruction is considered with, and as qualifying or supplementing the one complained of, it will be seen that the detrimental interpretation and effect

attributed by counsel to instruction 42, standing alone, is precluded or obviated. We think these two instructions, when considered together, and the entire list of instructions, when considered as a whole, contain a fair statement of the law as it applies to the issues of this case. It thus follows, under the above-cited rule, that the deficiencies alleged in the individual instructions constitute no ground for reversal.

Defendants' remaining proposition is that the jury's verdict of $70,000 was excessive. Their counsel recognizes that damages held to be excessive in one case may not be so adjudged in another, but they cite the elemental principles that damages in a death case are compensatory only and must bear a reasonable relation to the demonstrated earning capacity of the deceased (citing City of Sapulpa v. Deason, 81 Okla. 51, 196 P. 544). As hereinbefore indicated, the deceased was killed instantly. He was 42 years of age, but it was stipulated by the litigants that a life expectancy of 23.81 years for the plaintiff's widow would be considered, rather than the life expectancy of the deceased. Defense counsel points out that at the time of his death the deceased had held the job he then had with Monarch Construction Company only 22 months, that the record shows his total net earnings in this capacity for the first "10 months" of the year preceding his death, was $2,007.85. Counsel contends that this must have been his peak earnings, or else plaintiff's counsel would have introduced evidence of any higher wages he had made. They say this is an average of approximately $200 per month, which could not be relied upon to last during the deceased's elder or declining years, if he had lived. Counsel add that this amount would be giving plaintiff more than she would ever have personally benefited from her husband's earnings if he had lived, because it does not take into consideration the amount thereof that he would necessarily have had to spend for his own personal needs and upkeep.

The only element of plaintiff's damages or loss of which there was evidence as to actual monetary value was the deceased's earnings. The figure proven for his gross earnings (after withholding taxes) was $2,028.90 (including $21.05 deducted for old age retirement benefits) for a 9-month period immediately preceding his death. This was an average of $225.43 1/3 per months. For 23.81 years, at this rate, deceased would have had total earnings of $64,410.81, which with the funeral bill of $957.50 added, would make a total of $65,368.31, which, as will be seen, is considerably less than the amount awarded plaintiff by the verdict. In the course of necessary living and natural events, Mr. Sutton would have to spend some of this for his personal needs, so it cannot be said that this full amount would ever have been contributed by him to the plaintiff for her needs and/or wants. And the true measure of her loss on the basis of his wages could be no more than such contribution would have been. English v. Southern Pac. Co., 13 Utah 407, 45 P. 47; Pitman, Adm'r, v. Merriman, 80 N.H. 295, 117 Atl. 18, 26 A.L.R. 589, and annotations following; 25 C.J.S. 1299, Note 10; McCormick on Damages (1935 Ed.) pp. 341 and 342. In this connection, see also discussions in M., K. & T. Ry. Co. v. West, 38 Okla. 581, 134 P. 655, and St. Louis-S. F. R. Co. v. Floyd, 146 Okla. 42, 293 P. 250, 77 A.L.R. 1431. Plaintiff should have introduced evidence of this important element of her measure of damages, but didn't. In their brief, defendants' counsel make an arbitrary estimate of $60 per month for Mr. Sutton's own necessary personal and incidental expenses, and when such a deduction is made, plaintiff's damages are no more than $48,225.11, or $21,774.89 less than the verdict. Sixty dollars per month seems to us a modest deduction for this item in view of present living costs. If Buster Sutton's personal expenses were less than this, plaintiff should have introduced evidence tending to show what they were in dollars and cents (25 C.J.S. 788),

and then the court could have been requested to instruct the jury as to the proper measure of plaintiff's damages. See St. Louis-S. F. R. Co. v. Floyd, supra, and authorities therein cited. However, as she made no attempt in this direction, and we think that the jury's excessive verdict was due to its consequent failure to take into consideration that element in her measure of damages, we feel that she should remit $21,774.89 of the jury's award, or participate in a new trial, where she can properly prove her damages. She would then have further opportunity to establish the monetary value of any proper losses suffered by reason of her husband's death in addition to his contributions to her from wages. As to the effect of jury's ignorance of proper rule or measure of damages, see 2nd paragraph of syllabus in Public Service Co. v. Hawkins, 194 Okla. 272, 149 P. 2d 783. Therefore, in conformity with the precedent followed in Coker v. Moose, 180 Okla. 234, 68 P. 2d 504, and other cases, the judgment is affirmed, on condition that plaintiff file within ten days a remittitur of the judgment in the amount of $21,774.89, the excess over $48,225.11. Otherwise, the judgment of the trial court will be reversed and remanded for a new trial.

HALLEY, C.J., JOHNSON, V.C.J., and WELCH and DAVISON, JJ., concur. CORN and O'NEAL, JJ., concur in affirmance, but dissent as to remittitur.