333 F.2d 308
 Ethel CUNNINGHAM, as Administratrix of the Goods, Chattels
and Credits of Roman Cunningham, Deceased,
Libelant-Appellant-Appellee,
v.
REDERIET VINDEGGEN A/S and M/S TROLLEGGEN,
Respondents-Appellees-Appellants.
 No. 125, Docket 27832.
 United States Court of Appeals Second Circuit.
 Argued Nov. 4, 1963.
Decided June 18, 1964.
 
 Fuchsberg & Fuchsberg, New York City (Jacob D. Fuchsberg, New York City, of counsel), for libelant-appellant-appellee.
 Haight, Gardner, Poor & Havens, New York City (David P. H. Watson, Thomas F. Molanphy, Robert K. Marzik, New York City, of counsel), for respondents-appellees-appellants.
 Before WATERMAN, MOORE and SMITH, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 On January 29, 1959, the vessel M/S Trolleggen stood moored in New York's North River, on the south side of Pier No. 7, while her cargo was being unloaded. During the unloading operations, one Roman Cunningham, a fifty year old longshoreman working on the vessel, was killed when he was struck by a two ton hatch boom which fell on him without warning. His wife and administratrix, Ethel Cunningham (hereinafter libelant), his sole survivor, subsequently instituted this admiralty suit in the United States District Court for the Southern District of New York against the M/S Trolleggen and her owner Rederiet Vindeggen A/S (hereinafter respondent) to recover damages for the wrongful death of her husband.
 
 
 2
 Trial was had before the court, Levet, J., sitting without a jury. Since the accident which caused decedent's death occurred while the M/S Trolleggen was moored in New York territorial waters, libelant's rights in this action depended upon New York's Wrongful Death Act,[1] and the doctrine that 'where death * * * results from a maritime tort committed on navigable waters within a State whose statutes give a right of action on account of death by wrongful act, the admiralty courts will entertain a libel in personam for the damages sustained by those to whom such right is given.' Western Fuel Co. v. Garcia, 257 U.S. 233, 242, 42 S.Ct. 89, 90, 66 L.Ed. 210 (1921), quoted in The Tungus v. Skovgaard, 358 U.S. 588, 591, 79 S.Ct. 503, 506, 3 L.Ed.2d 524 (1959). The court below found that the hatch boom which struck and killed decedent had fallen because of its unseaworthy condition[2] and the negligent operation by the M/S Trolleggen's crew members of certain machinery connected to the boom, and that libelant was entitled to damages of $41,461.32, together with interest. Libelant has appealed on the ground that the damages awarded were inadequate, and respondent has cross-appealed on the ground that an error by the court below resulted in an award that was excessive. No issue was raised on this appeal concerning the liability of the respondent under the law of New York, and the only problem we are concerned with is the correctness of the amount of damages awarded.
 
 
 3
 We shall first discuss the issues raised by libelant's appeal. Libelant argues that the trial court committed five separate errors in computing damages, each of which served to reduce the award below its proper level. The five claimed errors are as follows: (1) the refusal to evaluate at more than $100 per year certain special services performed by decedent for his wife; (2) the limiting of decedent's work expectancy to age 65; (3) the failure to find that decedent had contributed to libelant more than half his income; (4) the failure to increase the award of damages to allow for inflation over the course of future years; (5) the computation of decedent's future lost earnings on the basis of his net income after the deduction of predicted federal and state income taxes rather than on the basis of his gross income. We find no merit in the first four points raised by libelant but we hold that the trial court committed an error in its treatment of the fifth point which requires us to reverse and remand for recomputation of damages in accord with this opinion.
 
 
 4
 The first three claimed errors cited by libelant call into question findings which the trial court made on the basis of evidence introduced on the issue of damages. These are findings of fact, and it is clear that a trial court's findings as to damages are to be accorded just as much weight on review as other findings of fact, e.g., Lukmanis v. United States, 208 F.2d 260 (2 Cir. 1953) (per curiam); Carroll v. United States,133 F.2d 690 (2 Cir. 1943); and, in suits in admiralty as well as in other cases, a reviewing court may not overturn a lower court's finding of fact unless the reviewing court is convinced that the finding is 'clearly erroneous.' McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); M. W. Zack Metal Co. v. S.S. Birmingham City, 311 F.2d 334 (2 Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 5
 We have examined carefully the record in this case, we have considered the evidence upon which the lower court based its findings of fact as to these elements of damages, and, while we would perhaps have arrived at figures a bit more generous to libelant had we been sitting as the trier of fact, we cannot say that the lower court committed clear error in making the assessment it did.
 
 
 6
 As to the value of the various special services which it was claimed decedent had performed for libelant, libelant testified in a general way as to the nature of the services and the approximate frequency with which they had been performed. When one recognizes, however, the difficulty of estimating accurately the money value of those services where the libelant failed to introduce evidence as to their money value, the $100 per year figure arrived at by the trial court, while perhaps near the lower end of the permissible range of estimation, cannot be called clearly erroneous. As to the finding that decedent shared his income with his wife on a fifty-fifty basis, a great deal of testimony was adduced from libelant on direct and crossexamination dealing with the particular types of expenditures she and decedent usually made, and we cannot characterize as clearly erroneous the trial court's conclusion that a synthesis of this testimony established a pattern that decedent's income was shared equally by husband and wife. Finally, though there was evidence that the average age of retirement for social security applicants is currently 67 years, the trial court could legitimately conclude that, in view of the demanding nature of decedent's work as a longshoreman, it was more probable that he would have retired at age 65 had he lived.
 
 
 7
 Libelant characterizes her fourth claim of error, that dealing with the lower court's refusal to increase the damage award to compensate for future inflation, as one involving an alleged mistake in the application of New York law. But we feel that it only involves, as do libelant's other claims of error already discussed, dissatisfaction with one of the lower court's findings of fact. While there is some lower court authority in New York to the effect that the trier of facts, in computing damages, may make allowance for the factor of inflation, Lucivero v. Long Island R.R. Co., 22 Misc.2d 674, 200 N.Y.S.2d 728, 730 (Sup.Ct., Kings County 1960); Neddo v. State, 194 Misc. 379, 85 N.Y.S.2d 54, 63 (Ct. of Claims 1948), aff'd, 275 App.Div. 492, 90 N.Y.S.2d 650 (3d Dep't, aff'd mem., 300 N.Y. 533, 89 N.E.2d 253 (1949), the only evidence introduced by libelant on the issue of an inflationary trend was the rather equivocal testimony of one expert witness, and the lower court was not clearly in error in refusing to be persuaded by it.
 
 
 8
 We now come to a consideration of libelant's contention that the trial court erred in computing decedent's future lost earnings on the basis of net income after taxes. The court, after estimating decedent's projected income for each of the remaining years of his work expectancy, deducted from the income figure for each year a sum for federal and state income taxes computed at current withholding rates. The resulting figures were then used to compute the lump sum due libelant as compensation for the loss of her share of decedent's future income, the court also crediting libelant with the anticipated future income tax on the portion of the award that was discounted for present enjoyment. We agree with libelant that the trial court erred in adjusting her award so as to take into account future income taxes so estimated.
 
 
 9
 Our decision here would be simple indeed if the courts of New York had as yet ruled on whether to use a decedent's gross or net income when computing the damages resulting from a wrongful death, for, as the court below correctly noted, when an admiralty court adopts a state's right of action for wrongful death, the court is obliged to enforce that right subject to whatever conditions and limitations the state has attached to it. The Tungus v. Skovgaard, supra, 358 U.S. at 592, 79 S.Ct. at 506. As we are unable to find any New York decision ruling on whether gross or net income is to be used in damage computations under New York's Wrongful Death Act, we are constrained to follow our own court's dictum in McWeeney v. New York, N.H. & H.R.R., 282 F.2d 34, 39 (2 Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), later recognized in this court's holding in Montellier v. United States, 315 F.2d 180 (2 Cir. 1963), which indicates that a federal court should use the gross income measure where applicable state law is silent as to any standard to use.
 
 
 10
 Respondent argues, however, that the applicable state law is not really silent on this issue. Our attention is called to that part of Section 132 of the New York Decedent Estate Law which limits the recovery in a wrongful death action to 'compensation for the pecuniary injuries' suffered by the person for whose benefit the action has been brought,[3] and we are cited to several New York cases recognizing that a distributee's pecuniary loss is measured by the amounts the survivor would have received from decedent's earnings if decedent had lived. Webster v. State, 18 A.D.2d 774, 235 N.Y.S.2d 620 (4th Dep't 1962) (mem.); Holmes v. City of New York, 269 App.Div. 95, 54 N.Y.S.2d 289, 292 (2d Dep't), aff'd per curiam, 295 N.Y. 615, 64 N.E.2d 449 (1945); Wilkinson v. Boehm, 231 App.Div. 295, 247 N.Y.S. 343 (3d Dep't 1931) (per curiam). Respondent then uses these statements of New York law as the basis for advancing the following three step proposition: Since New York law permits recovery in this suit for only that portion of decedent's future income which libelant would have received had decedent lived, and since libelant could not possibly have received that portion of decedent's future earnings which would have been withheld from him for income taxes, a sum representing decedent's net income after taxes must be used in computing libelant's award of damages.
 
 
 11
 The argument has a certain gloss of persuasiveness about it, due no doubt to its neatness and simplicity, but a careful analysis of respondent's reasoning convinces us that the argument completely misses the point. That New York's Wrongful Death Act permits recovery for only pecuniary losses suffered by a decedent's distributees aids respondent not one whit. The courts in the McWeeney and Montellier cases, supra, and, for that matter, every court which has ever undertaken to estimate damages resulting from the loss of future earnings, were concerned with determining the amount of 'pecuniary losses' sustained by an aggrieved party. The crucial issue is not, as respondent would have us believe, simply whether libelant would ever have received any of that portion of decedent's future earnings which would have been withheld for taxes. Rather, the crucial issue is whether a court can predict with sufficient certitude just what portion of decedent's earnings would have been placed beyond libelant's reach by future tax laws so as to permit the court justly to reduce the damage award which libelant would otherwise be entitled to. We think that the resolution of this issue in the McWeeney case, supra, based in part on an earlier decision of our court in Stokes v. United States, 144 F.2d 82 (2 Cir. 1944), requires us to rule that because of the speculative nature of any deduction for future income taxes the court below should have calculated libelant's damage award on the basis of her husband's future gross income before taxes.[4]
 
 
 12
 Nor are we persuaded by respondent's efforts to distinguish the McWeeney case on the ground that we were there concerned with the propriety of refusing to instruct a jury to use a net income figure in computing damages, while in this case the damages were computed by a court sitting without a jury.[5] While McWeeney did indeed deal with the difficulty a jury would have in applying an instruction framed in terms of net income after taxes, the important factors cited as causing difficulty there would appear to apply with almost equal force to a court sitting without a jury. Thus, the court in McWeeney pointed to the impossibility of predicting the number of future exemptions a taxpayer might become entitled to as well as the effective dates of such exemptions. Can it be seriously argued that a trial judge is for some reason more adept at making such predictions than a jury? Moreover, the McWeeney decision was based in part on the fact that plaintiff's judgment in a case like this is usually less than compensatory because of inflation and attorney fees, elements that are certainly unaffected by whether a court or a jury sits as the trier of fact. Finally, the way this court in McWeeney related its decision there to prior case law is a further indication that McWeeney cannot be legitimately distinguished on the ground that it dealt with jury instructions. The decision was explained as a continued adherence to Stokes v. United States, supra, where this court, branding deductions for future taxes as 'too conjectural,' affirmed the use of the gross income measure by a trial court sitting without a jury. More recently we had occasion to apply the rule of McWeeney to a suit under the Massachusetts Wrongful Death Act where we affirmed the refusal of a court sitting without a jury to deduct future taxes in calculating future lost earnings, Montellier v. United States, supra.[6]
 
 
 13
 There is a further reason for refusing to distinguish McWeeney on the ground that it dealt with the computation of damages by a jury. To so distinguish McWeeney would amount to sanctioning the use of two different rules of substantive law to be applied to identical sets of facts, with the one or the other rule to be applied depending upon whether a jury or a court were sitting as the trier of fact. While there are situations where the special training of a judge makes it permissible to follow different procedural rules when he is sitting without a jury, as, for example, when certain types of otherwise excludable evidence are allowed to be introduced, this is quite different from permitting a court to follow a different rule of substantive law because a judge is sitting without a jury. There is no possible way of justifying the application of different substantive rules of damages which would logically result in awards of lower recoveries in non-jury cases than in jury cases.
 
 
 14
 We have considered the case of O'Connor v. United States, 269 F.2d 578 (2 Cir. 1959), but we do not regard it as compelling the use of a net income figure in the case at bar. As we pointed out in McWeeney, the court in O'Connor was bound to apply the Oklahoma law of damages, and the case law of that state, far from being silent on the issue of the deductibility of taxes, clearly indicated that a net income figure was to be used. Although respondent argues that the Oklahoma law which the O'Connor court looked to was no more definitive on the subject than the New York law currently is, we do not agree with respondent. In Magnolia Petroleum Co. v. Sutton, 208 Okl. 488, 257 P.2d 307 (1953), explicitly relied upon by the court in the O'Connor case, 269 F.2d at 585, the Oklahoma Supreme Court, in computing a proper amount of damages for lost earnings, actually used a figure representing wages after the deduction of withholding taxes. 208 Okl. 488, 257 P.2d at 316. We have already discussed the comparable New York law on the subject, and it is obvious that there is nothing in that law that even approaches the clear directive the O'Connor court discerned in the state law of Oklahoma that it had to apply.
 
 
 15
 Finally, while McWeeney did not, and indeed could not, overrule O'Connor as to the necessity of applying a state's rule on gross or net income where that state's rule of damages was being applied, McWeeney did necessarily overrule O'Connor as to any implication in the O'Connor reasoning that tax deductions were not too speculative to be considered in assessing damages. Therefore, we hold that the trial court in the case at bar erred in deducting future income taxes when it computed decedent's lost earnings,[7] and hence libelant's award must be increased accordingly.[8]
 
 
 16
 We now reach consideration of respondent's cross-appeal. Respondent claims that the lower court erred in considering as a proper element of damages libelant's share of certain prospective pension payments of $85 per month to which decedent would have been entitled upon retirement. The pension in question, payable wholly from contributions of employers through the New York Shipping Association, is provided for in a collective bargaining agreement between the Shipping Association and decedent's union, the International Longshoremen's Association. The court below found that, in view of decedent's life expectancy and his probable age of retirement, he would have realized pension payments totaling $10,200 for the years 1975 through 1984. In view of the fact that libelant was entitled to one half of decedent's future lost income, the court therefore added to libelant's damage award an amount designed to compensate her for the loss of this $5,100 over the future ten year period.
 
 
 17
 At the time of the trial, libelant admittedly had already received a certain $7,000 death benefit which, had her husband been receiving a pension at the time of his death, would have been but $500. Respondent maintains that, because of libelant's receipt of this extra $6,500 libelant is not entitled to compensation for the $5,100 the lower court allowed as her share of her husband's expectant future pension payments. We disagree with respondent and uphold the trial court's ruling on this issue, though for different reasons than those set forth by the trial court.
 
 
 18
 The death benefits which libelant received are, like the pension payments already discussed, provided for by the collective bargaining agreement between decedent's union and the New York Shipping Association, and they, too, are financed by employer contributions. Under the terms of the bargaining agreement, the widow of a longshoreman on pension is entitled to death benefits in the amount of $500, while the widow of a longshoreman not on pension is entitled to death benefits amounting to $3,500 with double indemnity in case of accidental death. Thus, libelant, whose husband of course was not on pension when he was killed, received $7,000 in death benefits under the collective bargaining agreement, rather than benefits of only $500.
 
 
 19
 The lower court refused to take the fact of the increased death benefits into account on the ground that such benefits were irrelevant to the issue of damages under the 'collateral source doctrine.' According to this doctrine, which is an established exception to the general rule that damages in a negligence action must be compensatory, a wrongdoer is not permitted to reduce a plaintiff's recovery because of benefits which the latter may have received from another source.[9] Though the doctrine as it exists in New York does not extend to gratuitous benefits received by a plaintiff from a third party, Coyne v. Campbell, 11 N.Y.2d 372, 230 N.Y.S.2d 1, 183 N.E.2d 891 (1962); Drinkwater v. Dinsmore, 80 N.Y. 390 (1880), it is adhered to to the extent that benefits received by a plaintiff as a result of some consideration that has been previously extended do not reduce the size of a damage award under New York law. Coyne v. Campbell, supra, 11 N.Y.2d at 375, 230 N.Y.S.2d at 3-4, 183 N.E.2d at 892; Healy v. Rennert, 9 N.Y.2d 202, 213 N.Y.S.2d 44, 173 N.E.2d 777 (1961) (health insurance and pension benefits); Althorf v. Wolfe, 23 N.Y. 355 (1860) (proceeds of life insurance policy). Therefore, under New York law, if the present case is a proper one in which to apply the collateral source doctrine, the benefits received, not having been gratuitous, but having been compensatory employee benefits under a collective bargaining agreement, should not reduce plaintiff's award.
 
 
 20
 Our initial impression, however, is that the present case should not be viewed as involving the collateral source doctrine at all, and that respondent should be entitled to a reversal on its cross-appeal. It would seem that under the collective bargaining contract between the ILA and the New York Shipping Association plaintiff's decedent was entitled, as partial compensation for work performed, to either a pension plus $500 in death benefits for his widow or no pension plus $3,500 ($7,000 under the double indemnity provision) in death benefits. In no event could decedent have received, as an element of compensation under the bargaining contract negotiated for him by his union, both a pension and the larger death benefits for his widow. Thus, to permit libelant, who has already collected $7,000 in death benefits, to receive a sum representing her share of decedent's lost pension, would seem to ignore what decedent's income expectancy at the time of his death actually was under the collective bargaining contract.
 
 
 21
 We are required, nevertheless, to apply the law of New York in computing the damages in this case; and, as we read the decision of the New York Court of Appeals in Healy v. Rennert, supra, recently explained and reaffirmed in Coyne v. Campbell, supra, we must affirm the lower court's decision to include libelant's share of decedent's prospective pension in its computation of her damage award.
 
 
 22
 In the Healy case, plaintiff was a city fireman who, because of injuries sustained as a result of defendant's negligence, was forced to quit his employment several years before the permissible retirement age. At his trial plaintiff testified that, had he continued at his job, he would have been eligible in several years for a pension at half pay. Defendants then were permitted to introduce, over plaintiff's objection, evidence that as a result of the accident plaintiff had applied for and received a disability retirement pension at three-quarters pay. A unanimous New York Court of Appeals held this to be error, reasoning that such evidence should have been excluded on the ground that it was irrelevant to the issue of damages. The New York court could have reasoned that, under the terms of plaintiff's employment, he was entitled to either a regular pension at ordinary retirement age or a disability pension in the event of forced retirement at an earlier age, and that an accurate estimate of plaintiff's future lost earnings would have to take this fact into account. But the court in Healy did not so reason, and, since we regard the Healy case as indistinguishable from the case at bar, we hold that, under governing New York law, the court below did not err in including in its measure of damages a sum designed to compensate libelant for the loss of her share of decedent's prospective pension.
 
 
 23
 Reversed and remanded as to libelant's appeal and affirmed as to the cross-appeal.
 
 
 24
 MOORE, Circuit Judge (dissenting).
 
 
 25
 Here the burden placed upon the trial judge in this non-jury case after liability was established was to fix and award damages. In arriving at the award an important item was the calculation of the decedent's future lost earnings. This amount the trial judge computed on the basis of net income after taxes. Since the law specifically provides that the 'compensation' is for 'the pecuniary injuries' to 'the person or persons, for whose benefit the action is brought,' in this case the wife, the sole survivor, she cannot have lost more than the decedent would have received. Hence, in my opinion, the trial judge's computation was correct and I would affirm.
 
 
 26
 The problem here presented is probably more recurrent in the daily routine of the district courts than any other, namely, how to charge juries as to damages in personal injury cases or how in non-jury cases correctly to award damages in the event that a plaintiff has prevailed. Although the question of the relationship of the income tax to any award is only one phase of the damage problem, it is an important factor. As a result, the trial judges are entitled to as much enlightenment as appellate courts are able to produce. At the present time, and in my opinion, the light is a flickering beam of exceedingly low candle power in this circuit.
 
 
 27
 Since negligence cases are tried, jury and non-jury, the applicable law cannot be restricted to the one situation or the other. Therefore, even though this be a non-jury case, the law must be considered as it should be presented in a jury case as well.
 
 
 28
 After so many decades of the jury system, it may seem trite to even remined ourselves that a jury consists of laymen who have to be instructed in the law and who, in theory at least, are supposed to follow it. The members come to the jury box from all walks of life and with the usual number of misconceptions, preconceptions and conceptions possessed by the public generally. They have such knowledge as they gain from the daily press of which no small amount is gleaned from the sporting pages. There they learn that some gladiator of the prize ring by virtue of having remained slightly more conscious than his opponent for fifteen rounds has been awarded for such physical prowess a sum of close to one million dollars. This news is always accompanied by the announcement that some internal revenue collector is theoretically waiting in the dressing room of the gladiator to deprive him of a large portion of his winnings. Similar publicity is given to those who by dint of the right ticket and a fleet-footed horse have acquired an Irish Sweepstake fortune. In short, the place of the Internal Revenue in our society is firmly fixed in the minds of our populace. These are the minds which assemble in the jury room. Even though distinguished professors may attempt to probe into and discover a collective jury mind (and this is virtually impossible since the only accurate method of securing this knowledge is denied to them-- and to us as well) we cannot assure ourselves that some persuasive extrovert on the jury will not say: 'Sure, I know, all these verdicts, you have to pay taxes, if we want this fellow to get $50,000, you got to give him $100,000.' Some more reflective introvert may say, 'I don't know, I am not sure, why not ask the judge for instructions?' This is, of course, possible, but it is equally probable that in the jury room just as in life on the outside, reflective minds are frequently brushed aside, and capitulate.
 
 
 29
 The point need not be belabored further. The conclusion is obvious. Why have uncertainty when certainty can be so easily achieved? The function of the judge is to instruct the jury as to the applicable law. Every judge could incorporate into his charge the current law by saying, 'gross income does not include-- * * * (2) the amount of any damages received (whether by suit or agreement) on account of personal injuries * * *' (26 U.S.C.A. 104, Int. Rev.Code of 1954; for New York, see N.Y.Tax Law, McKinney's Consol.Laws, c. 60, 359(2)(e)). This court specifically recognized the validity of such a charge in saying in McWeeney v. New York, N.H. & H.R.R. Co., 282 F.2d 34, 2 Cir., 1960:
 
 
 30
 'Hence there would have been no error in the court's giving the instruction ('Your verdict is not taxable income to the plaintiff within one meaning of these tax laws').'
 
 
 31
 Under McWeeney, therefore, there surely can be no serious dispute that would not be held in error in giving trial judges such a charge as to the damage award.
 
 
 32
 However, the income tax question also arises in connection with the damage calculation. In New York (the law assumed to apply by the majority), section 132 of the New York Decedent Estate Law specifies that damages are to be 'fair and just compensation for the pecuniary injuries, * * * to the person or persons, for whose benefit the action is brought.' The keynote of the New York statute is 'compensation.' This court in O'Connor v. United States, 269 F.2d 578, 584, 2 Cir., 1959, recognized that, 'The compensatory nature of the right to damages under the Tort Claims Act requires such consideration of Federal Income Taxes; (and that) the plaintiff-appellee can recover only for losses sustained.' This circuit has made it abundantly clear that 'losses sustained' do not mean the decedent's salary, gross or net, but only the benefits derived from those earnings 'which could reasonably be expected to be dedicated to household and family use * * *.' (269 F.2d p. 585). This is a day and age of 'take home' pay. As this court held in O'Connor, the amount which the deceased employee had to divide with his wife and child was the amount he actually received. No part of his income tax deduction came to him. Even then the court only allotted two-thirds to family use until the child became 21 years old and one-half thereafter. This court then fixed a round figure as damages after various calculations including 'deducting estimated Federal Income Taxes.' See also the decision on a previous O'Connor appeal, 251 F.2d 939, 943, 2 Cir., 1958, wherein this court used three years' withholding statements as the bases for its illustrative calculations in computing the amount available for the support of wife and child. Yet O'Connor was a comparatively young man and could have had more dependent and deductible progeny.
 
 
 33
 Turning now to the non-jury trial (the situation here), I find no different base for damages. Nor should there be since the same rules of 'compensation' and 'losses sustained' apply to a judge's judgment as to a jury's verdict. The only difference is that the workings of a judge's mind are disclosed in his findings and opinion whereas the calculations of the jury whatever they may have been are totalled only in a general verdict and rarely revealed as specific items.
 
 
 34
 Certainly, the judge can instruct himself that the damage award is not subject to income tax. His problem is thus limited to the method used to compute the award. Both the New York statute and logic (and I submit, by proper interpretation, our own cases) compel the conclusion that in his search for proper compensation for the pecuniary injuries sustained the court should ascertain the amount of which the family is being deprived. After all, the purpose of the judge is to mete out a fair award and, in so doing, judges should not be altogether unmindful of the realities of life.
 
 
 35
 The customary proof submitted in negligence actions for the purpose of determining lost earnings, apart from pain and suffering and other special items consists of average salary or income for a period of years before injury or death. This figure is then multiplied by such factor as is applicable, obtained from life expectancy and/or work expectancy tables.
 
 
 36
 The trial court here believing that 'The recent trend in decisions favors the deduction of income taxes' based his computation upon decedent's net income. In so doing, the court relied primarily upon our O'Connor decision but as to trend referred to Floyd v. Fruit Industries, 144 Conn. 659, 136 A.2d 918, 63 A.L.R.2d 1378 (1957) and British Transport Com. v. Gourley (1956), A.C. 185, 2 W.L.R. 41 (1955).
 
 
 37
 The majority here concedes that they are unable to find any New York decision bearing upon the use of gross or net income in calculating damages. Parenthetically, I cannot understand why absence of case law should be considered a deterrent to the application of New York's clear 'pecuniary injuries' statute. Turning from strength to weakness, they are 'constrained' to follow 'dictum' in McWeeney, which they say somehow was buttressed by Montellier v. United States, 315 F.2d 180, 2 Cir., 1963. These slender reeds will not support the weight they would impose upon them. Indirectly recognizing this weakness, the majority create a wholly irrelevant 'crucial' issue, namely, 'whether a court can predict with sufficient certitude just what portion of decedent's earnings would have been placed beyond libelant's reach by future tax laws so as to permit the court justly to reduce the damage award which libelant would otherwise be entitled to.' The fallacies of this assumed issue are immediately apparent. First, a court's prediction with 'sufficient certitude' of most elements in a negligence case has never been an essential requirement. Net earnings at the time of the trial are known (or should be) with certitude. The courts do not know what the fates would have had in store for the decedent in the future. Nor can there be prediction with certitude as to the degree of physical recovery of the injured; yet judgments based on presently known facts are rendered every day. Second, earnings are not placed beyond libelant's reach. His tax share or contribution to government maintenance are not his to reach for. If the majority believes with certitude that the abolition of the federal income tax lies just around the corner, this may be encouraging to the taxpayer but it is a view scarcely justified by the pattern and state of our national economy. Third, the trial court is not reducing an amount 'which libelant would otherwise be entitled to.' This begs the very question here for decision. The sole basis of the award should be to provide that which he, and through him his family, would have received. He could scarcely enjoy that which had been sent to the Internal Revenue District Director. Therefore, the too speculative argument rests on a false premise. Of course, many hypothetical situations can be imagined. Children will be exemptions; over 21 years of age they will not be. Single men may marry; married men may become widowed. But the salary check actually received will continue to be all that the employee has to spend and divide with his family.
 
 
 38
 In this circuit we have had Stokes v. United States, 144 F.2d 82, 2 Cir., 1944; O'Connor; McWeeney and Montellier. In Stokes the trial judge refused to make a deduction for income taxes in estimating expected earnings. This court found no error in this refusal, merely saying, 'such deductions are too conjectural.' In O'Connor a deduction for estimated Federal income taxes made by a judge in a non-jury case was definitely approved. McWeeney was a jury case in which the issue was raised by the refusal of the trial court to give two requests, one, that no sum was to be added to any verdict because of income taxes and the other, that loss of earnings must be calculated on the basis of net income after taxes. A reading of the majority opinion in McWeeney reveals rather clearly a belief that the increased salary base because of failure to submit net earnings to the jury was considered as an offset to the inroads of inflation and counsel fees. This surmise is supported by the majority's own construction of McWeeney which they say was decided 'in part on the fact that plaintiff's judgment in a case like this is usually less than compensatory because of inflation and attorney's fees * * *.' Montellier was a non-jury case. Although this court did not hold failure to deduct income taxes from gross to be error, it did say, 'It would not have been erroneous, under the rule of McWeeney * * * for the trial judge to have made a deduction for income taxes, which would have amounted to a substantial sum in this case' (315 F.2d p. 186).
 
 
 39
 The trial judge here was charged with the duty of making a fair award for the pecuniary losses sustained. He has carefully computed such a figure. It is indeed a legal anomaly to say that the plaintiff must receive in addition an amount equivalent to the Federal and State income taxes in which the decedent never would have had a pecuniary interest.
 
 
 40
 The courts are frequently accused of being oblivious to the facts of life. In their ivory towers they are said to be unaware of the realities. Yet since virtually every case to be decided deals with some phase of human existence, the judiciary should endeavor to be most conversant with the practical aspects of the problems submitted. Earl Jowitt expressed this thought in the British Transport case, supra, saying: 'My Lords, I agree with Lord Sorn in thinking that to ignore the tax element at the present day would be to act in a manner which is out of touch with reality' (p. 48). Lord Goddard in considering 'whether in calculating the damage the incidence of tax should be taken into account and whether it is an element to be considered in assessing general damage' held that it was and that, 'Generally damages must be decided by the application of reasonable common sense' (p. 54). The House of Lords overruled Billingham v. Hughes (1949), 1 K.B. 643 and cases holding that the income tax was not be considered as an element, Lord Tucker stating, 'I am persuaded that the decision in Billingham v. Tucker, to which I was a party in the Court of Appeals, was erroneous' (p. 59).
 
 
 41
 In Floyd v. Fruit Industries, supra, the Connecticut Supreme Court of Errors said, 'For all practical purposes, the only usable earnings are net earnings after payment of such taxes' (136 A.2d p. 925). Recognizing that in some jurisdictions evidence of income taxes has been held inadmissible[1] and referring specifically to the Stokes case in this circuit and Chicago & N.W.R. Co. v. Curl, 178 F.2d 497, 502 in the Eighth, the court stated that it was 'not impressed by the reasoning of these cases.' Neither am I.
 
 
 42
 'The argument for computing damages on estimated income after taxes is a clear one; this will measure the actual loss. If plaintiff gets, in tax free damages, an amount on which he would have had to pay taxes if he had gotten it as wages, then plaintiff is getting more than he lost.' 2 Harper & James, The Law of Torts, 25.12. As to the speculative aspect the authors answer this argument by saying, 'Moreover future taxes are no more speculative than many other items that go into prophecies about future losses in this uncertain world * * *' Since there can be no uncertainty in calculating damages for past losses when the exact tax is known, since loss of future earnings is based upon proof of past earnings and since the likelihood of our living in a tax-free society within the life span of this present court is minimal, I would prefer to decide the applicable rules of law upon the existing state of our tax structure, and let others cope with that Utopian era of the future which underlies the decision of the majority.
 
 
 43
 I not only do not find the award of the trial court to have been clearly erroneous, I find it the only proper computation within the meaning of the New York statute and the principles of just compensation. Therefore, I would affirm the judgment.
 
 
 
 [1]
 N.Y. Decedent Estate Law, McKinney's Consol.Laws, c. 13, 130. The statute provides as follows:
 'The executor or administrator duly appointed in this state, or in any other state, territory or district of the United States, or in any foreign country, of a decedent who has left him or her surviving a husband, wife, or next of kin, may maintain an action to recover damages for a wrongful act, neglect or default, by which the decedent's death was caused, against a natural person who, or a corporation which, would have been liable to an action in favor of the decedent by reason thereof if death had not ensued. Such an action must be commenced within two years after the decedent's death. When the husband, wife or next of kin, do not participate in the estate of decedent, under a will appointing an executor, other than such husband, wife or next of kin, who refuses to bring such action, then such husband, wife or next of kin shall be entitled to have an administrator appointed for the purpose of prosecuting such action for their benefit.
 
 
 [2]
 As the trial court correctly noted, the New York courts have ruled that Section 130 of the New York Decedent Estate Law authorizes the maintenance of an action based on unseaworthiness. The condition of unseaworthiness is said to be embraced by the term 'wrongful act, neglect or default' as used in the statute. Clark v. Iceland S.S. Co., 6 A.D.2d 544, 179 N.Y.S.2d 708 (1st Dep't 1958)
 
 
 [3]
 Section 132 provides as follows:
 'The damages awarded to the plaintiff may be such a sum as the jury upon a writ of inquiry, or upon a trial, or, where issues of fact are tried without a jury, the court or the referee, deems to be a fair and just compensation for the pecuniary injuries, resulting from the decedent's death, to the person or persons, for whose benefit the action is brought. In every such action now or hereafter pending, in addition to any other lawful element of the damages recoverable, the reasonable expenses of medical aid, nursing and attention incident to the injury causing death and the reasonable funeral expenses of the decedent paid by a husband or wife or next of kin or for the payment of which any such person is responsible, also shall be deemed proper elements of damage. If the decedent leaves surviving a father and a mother, the death of such father prior to the verdict shall not affect the amount of damages recoverable. Interest upon the principal sum recovered by the plaintiff, from the date of the decedent's death, shall be added to and be a part of the total sum awarded.'
 
 
 [4]
 The court in McWeeney, while noting the speculative nature of a deduction for income taxes, also indicated that in certain cases involving extremely high incomes the injustice which would result to a defendant from ignoring future taxes might outweigh the injustice which would ordinarily be done a plaintiff by reducing the award of damages to allow for the speculative tax element, 282 F.2d at 38-39. Since the average annual income of decedent here was not in an upper income range, we need not concern ourselves with this possible exception to the rule of McWeeney
 
 
 [5]
 It was on this basis that the court below distinguished the McWeeney case
 
 
 [6]
 While the court in Montellier did indicate that it would have affirmed the lower court had it taken the opposite course of deducting a sum for future taxes, 315 F.2d at 186, this statement was not prompted by any doubt as to the applicability of McWeeney to a non-jury case. Rather, as the opinion in Montellier makes clear, it was due to the court's belief that the annual income there involved was large enough so that the lower court, in its discretion, could have utilized the exception to the McWeeney rule which we have discussed in footnote 4, supra
 
 
 [7]
 In banc action was requested on this issue by a member of the court, but the request failed to receive the support of a majority of the active judges
 
 
 [8]
 As we have stated, the lower court, in addition to deducting future taxes in computing the lost earnings due libelant, also credited libelant with a sum designed to take into account the taxes on the portion of the award that was discounted for present value. Recomputation of the proper damages due libelant must, since future taxes are not a proper consideration in computing future lost earnings, eliminate any sum designed to credit libelant with future taxes on the discounted portion of the award
 
 
 [9]
 For a general discussion of the doctrine in the United States, see Maxwell, The Collateral Source Rule in the American Law of Damages, 46 Minn.L.Rev. 664 (1962)
 
 
 [1]
 For a comprehensive annotation on the subject, see 63 A.L.R.2d 1378, 1393-1425