**Shirley Roberts LAIRD, Individually and for and on behalf of the minors Michael Gray Laird and Johnny Mark Laird, Plaintiff-Appellee,**

v.

**HUDSON ENGINEERING CORPORATION, Defendant-Appellee,**

**and**

**United States Steel Corporation, Defendant-Appellant.**

**No. 30676.**

United States Court of Appeals, Fifth Circuit.

Sept. 29, 1971.

Rehearing Denied Oct. 28, 1971.

Leon Sarpy, Paul A. Nalty and James R. Nieset, New Orleans, La., for U.S. Steel Corp.; Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., of counsel.

Joseph L. Waitz, Waitz & St. Martin, Michael St. Martin, Houma, La., for Laird.

Philip J. McMahon, Houma, La., James H. Drury, New Orleans, La., Edmund McCollam, Borowski, Lofaso, McMahon & McCollam, Houma, La., for Hudson

Eng. Corp.; Drury, Lozes, Young & Curry, New Orleans, La., of counsel.

Before O'SULLIVAN,* THORNBERRY and INGRAHAM, Circuit Judges.

PER CURIAM.

In this appeal from a jury verdict below finding the appellant U. S. Steel liable for the wrongful death of plaintiff Laird's husband, U. S. Steel raises some fourteen points of error. The first five points of error attack in one form or another the sufficiency of the evidence to support the jury verdict.

 After a review of the Record, we conclude that the evidence was sufficient to support the jury verdict, and satisfies the "sufficiency" standard under which we review jury findings. Stockton v. Altman, 5th Cir. 1970, 432 F.2d 946. In its sixth point of error, U. S. Steel complains that interest on the judgment should not have been allowed from the date of judicial demand pursuant to 13 L.S.A.–R.S. 4203, because an award of prejudgment interest violates the appellant's Seventh Amendment right to a jury trial. There is no merit to this contention. This Circuit has recognized in several cases Louisiana's rule on awarding interest from the date of judicial demand, and has upheld the right to such interest. See, e. g., Texaco Inc. v. Lirette, 5th Cir. 1969, 410 F.2d 1064. Appellant's remaining eight points of error attack various discretionary decisions and evidentiary rulings of the trial judge.

██ We have reviewed each of these contentions and find they all lack merit. Only two of them require comment. U. S. Steel complains of the trial judge's refusal to relax his pre-trial order to allow an additional expert witness to testify for U. S. Steel at the last minute. This was clearly within the trial court's discretion, and we see no abuse of discretion in his refusal to relax the pre-trial order in this instance. Moreover, it appears that the additional expert's testimony would have been cumulative.

██ U. S. Steel also complains about the trial court's refusal to grant a remittitur as to $238,000.00 in damages awarded the plaintiff for loss of support for herself and her two children. The evidence presented to the jury amply supported this award, and certainly does not warrant any interference by this Court in the trial judge's discretionary decision to deny remittitur. No other point of error as to damages is raised by the appellant.

Affirmed.

O'SULLIVAN, Senior Circuit Judge (dissenting):

I respectfully dissent. I do so because the size of the recovery impelled me to consider whether the trial procedures visited any unfairness upon appellant United States Steel. As set out hereinafter, I am persuaded that such did occur.

Because the majority opinion is silent as to the facts which brought about this lawsuit, I recite those necessary to an exposition of my own views. The amount of $238,000, the figure mentioned in the majority opinion, was awarded for loss of support. Additional amounts allowed for decedent's pain and suffering for loss of companionship, and for some miscellaneous expenses brought the total recovery to $415,287.85.

Plaintiff's decedent, Malcolm Gray Laird, then 37 years of age, received fatal burns when an explosion occurred in a pipeline located at the premises of Shell Oil Company near Gibson, Louisiana. The catastrophe occurred on December 17, 1968. Malcolm Laird died on December 28, following. He suffered very great pain during the days that intervened. On the date of the explosion, the deceased, a night shift foreman in the employ of Shell, was earning $800 per month. He was survived by his widow and two minor children, Michael Gray Laird and Johnny Mark Laird, aged 13 and 9, respectively.

---

* Senior Circuit Judge, 6th Circuit, sitting by designation.

This lawsuit was started in the United States District Court for the Eastern District of Louisiana on March 6, 1969, naming as defendants United Gas Industries, Inc., United Pipeline Company and Pennzoil United, Inc. The case against these defendants was dismissed when it was disclosed that they had nothing to do with the installation or operation of the pipeline. On May 2, 1969, an amended complaint was filed naming Hudson Engineering Corporation as defendant and charging it with negligence in the design, construction and fabrication of the gas transmission line and its connection with a gas transmission line owned by Shell Oil Company leading into the latter's plant. The explosion occurred at the place of this connection, and it was established that such connection had been made by Hudson Engineering under contract with Shell Oil Company some four or five years before the explosion. The appellant United States Steel was not named or accused of any wrongdoing in the first amended complaint filed some five months after the fatal accident.

On August 26, 1969, another amended complaint was filed—this time adding the United States Steel as a defendant, charging that Steel had manufactured and furnished the 30″ pipe that made up the main gas line that led to the "connection." This complaint then charged that U. S. Steel *and* Hudson were negligent because of "improper and faulty design, construction, fabrication and manufacture" of the main pipeline and the "connection." Thereafter, Hudson filed a cross-claim against U. S. Steel, its allegations casting the entire blame for the accident upon Steel.

The stage for this disaster was set in 1964 when, pursuant to a contract with Shell Oil, Hudson Engineering constructed a gas processing plant at the site in question. Supplemental to this original contract, Hudson agreed to extend a 30″ gas line to the plant at a depth of five feet below the ground from a flange on a previously installed 30″ gas transmission line coming in from the Gulf Tidelands. Another gas transmission line, 12¾″ in diameter and owned by Shell, would intersect with the 30″ line at a point some distance from the plant. The 12″ line approached the 30″ in a perpendicular direction, three feet above the ground, with a valve several feet from the 30″. Hudson connected the 12″ into the 30″ by using a "Weldolet," a device which required cutting a hole in the 30″ pipe and welding this Weldolet to the two lines. Except for the explosion on December 17, 1968, there was no evidence of any difficulty with the performance of the 30″ pipe which had been furnished by U. S. Steel. It continues in use at the Shell Oil plant.

The case came on for trial to a jury on June 8, 1970, Hudson charging that the inferior quality of the 30″ pipe which had been furnished by Steel was the sole cause of the explosion, and Steel charging that carelessness of Hudson in designing and making the connection was the cause of it. Resolution of the issue of proximate and responsible fault became primarily a contest of experts hired by the antagonists, although Steel produced some of its own people. Hudson produced none of its people who had designed and carried on the work of making the involved connection. Its vice-president, one Battershell, who had been Hudson's project engineer on the job—listed in a pretrial order as a witness it would produce at trial—had gone to Australia at the time of trial and Hudson was allowed to provide a substitute for him. The witness, however, was not called by Hudson but by plaintiffs, whose counsel enjoyed the advantage of cross-examining him as an adverse witness. As discussed later, Steel charges error in this allowed change of witnesses. None of the persons listed at pretrial as those employees of Hudson who had made the installation where the explosion occurred was produced. Shell Oil Company was allowed to intervene as a party plaintiff to seek recovery for the cost of fulfilling its Workmen's Compensation obligations to the widow of the decedent. It charged that the death of its employee resulted

from negligence of Hudson Engineering and U. S. Steel. The evidence showed that promptly after the explosion, with the consequent death of its employee and damage to its plant, Shell began an investigation of the scene of the explosion. It used men from its engineering staff, some of whom qualified as experts in the relevant field. The investigating team totalled some six men. They made a written report of their findings which was ambivalent as to fixing the blame for the casualty. This staff-written report contained the following conclusions:

"Preliminary conclusions based on visual inspection of the ruptured pipe are that the rupture originated from a brittle crack in the base metal of the 30-inch pipe at the toe of the weld attaching the 30 x 12 Weld-O-Let to the pipe. It appears that the brittle crack was formed some time prior to the failure and resulted from residual stresses developed during the fabrication or from the combination of these residual stresses and subsequent mechanical damage. It is further concluded that damage to the existing plant would have been lessened by different design of certain plant components."

It will be noted that this conclusion did not fix the total blame upon the U. S. Steel pipe, nor forecast the opinions that would be expressed by the experts hired by plaintiffs and Hudson.

None of these Shell investigators, however, was produced by the plaintiffs, by Shell, or by Hudson. The defendant called some of these men, but was denied the opportunity to cross-examine them or use the above report in such examination—this notwithstanding that their employer, Shell Oil, had become a party adverse to U. S. Steel. Their trial testimony can be read as, in some measure, downgrading their first expressed views as being only "preliminary." Hudson Engineering was not employed to make the repairs required by the explosion.

At trial, plaintiffs together with Hudson Engineering and Shell Oil were aligned in casting blame on Steel. Plaintiffs called as a witness for cross-examination Hudson's named expert who found agreement with plaintiffs' expert in assigning the cause of the explosion to inferior quality of the pipe furnished by Steel. Plaintiffs' proofs were so acceptable to Hudson and Shell that the latter rested their cases at the close of plaintiffs' proofs. By direction of a pre-trial order, the jury was required first to determine liability. It exonerated Hudson. It was then directed to assess plaintiffs' damages against U. S. Steel only.

The judgment entered, $415,287.85, comprised the jury's award to the widow and minor children of plaintiffs' decedent of $238,000 for loss of support, $100,000 for pain and suffering of the deceased during the eleven days that he survived his fatal burns, $70,000 for loss of companionship of the deceased husband and father, and $7,287.85 for medical and funeral expenses. To the figure of $415,-287.85 there was added interest at 5% from August 26, 1969, the date when appellant United States Steel was added as a party defendant to the suit. If we may assume that it will take to August 26, 1971, to bring this matter to finality, there will be added to the judgment $41,-528.78 for interest, making a total amount to satisfy the judgment of $456,-816.63. The deceased's earnings at the time of death were $9,600 per year. If the amount to be paid in satisfaction of the judgment were invested at a yield of 5% per annum, such investment would provide a yearly income of approximately $23,000 for the remaining life of the plaintiff widow, or for whatever period the sum remained invested, and at the end of such period the entire principal sum would still be intact.[1]

1. I am aware that reductions must be made for attorney fees and for what will be due to Shell Oil Co., the deceased's employer, for whatever amount it will have paid, up to August 26, 1971, on account of its liability under the applicable Workmen's Compensation Law.

Plaintiffs' proofs included testimony by an actuary who calculated that the earnings of the deceased, had he lived out his total work life expectancy of 26.8 years, would have totalled $353,148. We assume that the reduction to $238,000 portrays the jury's reduction of the actuary's figure upon taking into account the cost of deceased's own support, and their assumption that he would have devoted substantially two-thirds of his income to his wife and two children. Such calculation would permit a recovery of about $235,000. This was what plaintiffs' attorney suggested in his closing argument.

In order to come up with his total, plaintiffs' actuary assumed that the deceased's earnings would have increased at the rate of 6% per year, from a $12,000 salary, which plaintiffs' testimony averred the deceased would have been earning at the end of three years following the date of his death. This, of course, was an arbitrary assumption. It assumes that in the 26th year of the deceased's expectancy he would be earning about $40,000 per year—contributing two-thirds of it to his wife and children, or to the widow alone after his children had reached their majority. The actuary's calculations were based upon the deceased's present and future earnings in gross, without any factor for the impact of income tax. Thus, his figure was constructed upon an assumption that the deceased would not have had to pay tax upon his ever-increasing income. This is, of course, a distortion.

Just before the jury was to retire, the following colloquy occurred:

"By Mrs. Gabb [a juror]: May I ask a question? You just said that we should not consider attorneys' fees or costs of court or interest. What about Federal tax on this amount awarded here? Is that taxable?

"By the Court: You are not to consider this. You will make your determination but without regard to *the tax* on the amount that you may award. (Emphasis supplied.)

"By Mr. Sarpy: But there is the income tax on the earnings.

"By the Court: Well, the income tax that Mr. Sarpy referred to was the tax on the possible earnings of Mr. Laird, and the contention that taxes would be withheld on his earnings would affect the amount that would be available for his own support, as well as for the support that he would contribute, or might be expected to contribute, to his wife and children.

"By Mr. Sarpy: Judge, I think the question of tax on the award itself, the Court mentioned that there would be no tax on that.

"By the Court: I did not mention that at all. I said the jury was not to consider that.

"By Mr. Sarpy: Not to consider it?

"By the Court: Whether there was or was not."

I am aware that this Circuit has held that the trial judge is not required to tell the jury that an award of damages in a death or personal injury case is not subject to income tax. Cunningham v. Bay Drilling Co., 421 F.2d 1398 (5th Cir. 1970); Prudential Ins. Co. v. Wilkerson, 327 F.2d 997 (5th Cir. 1964). Such also is the rule in the Sixth Circuit case, Payne v. Baltimore & Ohio R.R., 309 F.2d 546, 550 (6th Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1865, 10 L.Ed.2d 1051. The writer dissented on this point, saying:

"Our contemporary public mind is well conditioned to the belief that, today, there is almost nothing of money value which anyone receives that is not shared in substantial degree with the national government. As pointed out by Chief Judge Lumbard in his dissent in McWeeney v. N.Y.N.H. & H.R. Co., 282 F.2d 34, 41 (C.A. 2, 1960), the public today reads of the rather spectacular share that the government takes of large sums 'won on television quiz programs or in lotteries and sweepstakes.' The public is informed of the amount that is taken in income taxes from large salaries paid to busi-

ness executives, stars of the entertainment world and other large earners, and the amounts that are taken in taxes from decedents' estates. Have we any assurance that today's juries, awarding verdicts in the range of the one before us, $136,267.23, are aware that, unlike almost any other receipt of money, they are tax free? I would venture a guess that a substantial number of lawyers (excluding those engaged in the personal injury business) would be unsure of the tax consequences of receiving a $100,000.00 personal injury verdict. Should we expect jurors to be better informed?" 309 F.2d at 552–553.

I am satisfied that soon the involved rule will be changed to require some recognition of the patent unfairness of refusing any help to juries who will be unsure of their own responsibilities in arriving at verdicts. See Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245 (3rd Cir. 1971), and also Chief Judge Lumbard's dissent in McWeeney v. New York, N.H. & H.R.R, 282 F.2d 34, 41 (2d Cir. 1960); and my dissent in Payne v. Baltimore & Ohio R.R., supra, 309 F.2d 546, 550 (6th Cir. 1962).

What happened in the case at bar provides, in my view, sound reason for not applying the rule of the cases which merely refused to find reversible error in denying a request upon the point. In this case, defendants' counsel had, in his argument, said to the jury that the calculation of deceased's earnings had he lived had not taken into account the income taxes that would have had to be paid, and then told the jury, "any amount that you give him will be free from income taxes." Quite obviously, counsel's statement did not satisfy all the jury on the point. I have set out above what the judge told the jury upon inquiry by one of them. At this distance, it would be quite difficult to be sure whether or not the judge's twice mentioning the subject:

"You will make your determination but without regard to the tax on the amount that you may award."

and,

"I did not mention that at all. I said the jury was not to consider that."

was not, in effect, telling the jury that defendants' counsel had misinformed them when he said that their award would not be subject to tax. Out of all of this, I feel that this jury could indeed have the impression, or at least be unsure, but that plaintiff would have to pay income tax on whatever verdict they gave. I observe that just before the quoted colloquy about income tax, the judge had said to the jury:

"In further considering the amount Malcolm Laird might have earned or the amount he would have contributed to the support of his surviving wife and children, you may consider the probabilities of inflation, depression, or a stable economy. In so doing, you may consider such things as increases and decreases in the cost of living and the wage-price ratio as your own common knowledge and experience may dictate.

"Similarly, in awarding damages, if any, you may consider *the decreased purchasing power of the dollar*." (Emphasis supplied.)

Having been told these things, clearly calculated to enhance their award of damages, can it be considered fair to have left them with the impression or the passive fear that a large amount of their verdict would be taken for income tax?

Why should we not have the sophistication and courage to baldly recognize that no such verdict would likely have been entered here except for the circumstance that the United States Steel Corporation is the defendant? In a day of much talk about equal protection of the law, should not the courts carefully consider whether a particular verdict came about from the apparent ability of the involved defendant to pay, rather than from a fair measuring of liability and damages?

My brothers, however, do not consider the verdict excessive. Its size, however, and my impressions of some of the trial procedures set out above and hereinafter,

urge me to consider whether trial errors contributory to the size of the verdict call for a new trial. See Home Ins. Co. of New York v. Tydal Co., 152 F.2d 309, 311 (5th Cir. 1945); Sinclair Refining Co. v. Tompkins, 117 F.2d 596, 597 (5th Cir. 1941). I am of the view that the trial judge committed reversible error in refusing defendant's request to use an expert rebuttal witness because his name was not disclosed in the initial pretrial exchange of names of expert witnesses to be used at the trial. If denial of use of such rebuttal witness would ordinarily be an exercise of discretion by a trial judge, I would, in the total context of the trial involved, hold that the trial judge abused his discretion.

In the majority opinion, my brothers dispose of the trial court's refusal to allow appellant to call a named rebuttal witness as follows:

"U. S. Steel complains of the trial judge's refusal to relax his pre-trial order to allow an additional expert witness to testify for U. S. Steel *at the last minute*. This was clearly within the trial court's discretion, and we see no abuse of discretion in his refusal *to relax the pre-trial order* in this instance. Moreover, it appears that the additional expert's testimony *would have been cumulative.*" (Emphasis supplied.)

With great respect, may I observe that appellant's request to call this rebuttal witness did not come *at the last minute*. Neither would it have been contrary to *the pretrial order* to have allowed this rebuttal witness to testify, and we have no way of knowing whether this witness' testimony *"would have been cumulative."* The trial of the case had been set for June 8, 1970. On May 8, 1970, 30 days prior to the trial date, U. S. Steel's counsel filed a notice that one M. E. Holmberg might be called as an expert witness. Notice of this was given to all counsel of record on the day it was filed. On June 3, 1970, plaintiff filed its opposition to appellant's calling such witness, averring that it would be unfair to allow U. S. Steel "to surprise the other parties with

a witness who has not been deposed * * *." On June 3, 1970, the trial judge entered an order denying Steel the right to call the named witness, recognized as a rebuttal witness. The pretrial order of January 6, 1970, referred to above contained the following:

"In the event there are other witnesses to be called, at the trial, *at least ten (10) days prior,* the names, addresses and the general subject matter of their testimony will be reported to opposing counsel, and a supplemental note of evidence will be filed into the record of the case, but that *this restriction shall not apply to rebuttal witnesses,* the necessity of whose testimony cannot reasonably be anticipated before the time of trial." (Emphasis supplied.)

The plaintiff had ample time between May 8, 1970, and the fixed trial date in which to take a discovery of the witness that defendant proposed to call. It would appear, therefore, that U. S. Steel's notice of its intention to call M. E. Holmberg as a rebuttal witness was not *at the last minute* and the proposal to do so *was not at odds with the pretrial order.* It was given more than ten days prior to trial, and the relevant pretrial order specifically said that it "did not apply to rebuttal witnesses."

Rule 16, Fed.R.Civ.P. covering pretrial procedure provides for a conference to consider "The limitation of the number of expert witnesses." The order before us did not attempt to set the number of experts to be used by either side. Although this writer has heard that some District Judges, devotees of the asserted virtues of elaborate pretrial, require counsel to give advance notice of the names of rebuttal witnesses, I question the power of a trial judge to do so. Any lawyer worth his salt should refuse to commit himself in advance as to what witness, or witnesses, he might need for rebuttal. How can he do this until he has heard his adversary's proofs at trial? Discovery depositions are helpful, but witnesses, especially experts, do not always stick to the text of discovery depositions.

In contrast to his refusal to allow U. S. Steel to call a theretofore unnamed rebuttal witness, the trial judge allowed defendant Hudson Engineering to substitute a new name for one that they had listed as a so-called "will call" witness. Defendant Hudson Engineering, who had aligned itself with plaintiffs' effort to cast blame for the tragic accident upon Steel, thus to exonerate itself, had given the name of its vice-president, Battershell, as a witness it would call. He was identified as the project engineer for Hudson Engineering on the connection work whereby it cut the hole in the pipe alleged to have been furnished by U. S. Steel. A new witness was to be substituted for Battershell because it was urged that Battershell had to be in Australia at the time scheduled for commencement of the trial on June 8. Request to substitute one Darnielle for Battershell was not made until June 5, the Friday before commencement of trial on the following Monday.

Hudson's brief to this Court offers an explanation of its failure to produce its one employee — a vice-president — who would have known the most about how the work of cutting into the pipe furnished by U. S. Steel and making the so-called connection at the site of the explosion had been carried on. The explanation is that sometime shortly prior to June 1, 1970, it was thought that the trial would not go ahead on June 8, 1970, the date originally set. However, on June 1, 1970, at a pretrial conference, June 8 was reinstated as the trial date. The brief asserts that Hudson's counsel then said there was a *possibility* that Battershell would have to go to Australia and "that this trip could not be postponed." No attempt has been made to tell why Battershell's trip to Australia "could not be postponed." My reading of this explanation is that Battershell was still in the United States when the original trial date of June 8, 1970, was reinstated on June 1, 1970. He apparently left on the eve of the trial. With Battershell lately gone to Australia, and no others of Hudson's people who had actually worked on installation of the so-called "connection" produced, Steel was deprived of the opportunity to make pertinent inquiry of the men who had done the work as to just how such "connection" had been made. Interrogatories which U. S. Steel had directed to Hudson asked:

"13. Give the names and addresses of the foreman and all of your employees and representatives who worked on the original installation of the 30″ line in question at the North Terrebonne Plant of the Shell Oil Company."

\* \* \* \* \* \*

"16. Identify the persons who performed the welding operations on the Weldolet unit, or were witnesses thereto, including the welding foreman, superintendent and each welder."

Hudson's answers to the foregoing were:

"13. The following are the personnel known by Hudson, who worked on the tie-in at the 12″ and 30″ lines:

Project Engineer: David D. Battershell, 657 Strey Lane, Houston, Texas. [The man who went to Australia]

Superintendent: Ray Hodges, P.O. Box 460, Falfurrias, Texas.

Welding Supervisor: Roy Roberts, c/o Hudson Engineering, 5900 Hillcroft, Houston, Texas.

Testing Supervisor: Frank Brasher, P.O. Box 908, Clute, Texas."

\* \* \* \* \* \*

"16. Ray Hodges, Superintendent.

Roy Roberts, Welding Supervisor.

Warren Newman, welder.

Earl Lishman, Jr., welder.

A. J. LeBlanc, welder.

John Kristicevich, welder."

These answers show that Edward Darnielle, the witness substituted for Hudson's "boss man" on the involved job—Project Engineer David D. Battershell—was not mentioned as having anything to do with, or knowing anything about, the job in question. Not one of the persons named in Hudson's above answers were produced at the trial.

Thus, it will be seen that Hudson Engineering who made the involved installation, and Shell Oil who promptly investigated the cause of the explosion, both did a rather spectacular job of "hiding out" with their own knowledgable people. U. S. Steel proffered an instruction which would have told the jury,

> "You are instructed that the failure of Hudson to produce witnesses to testify concerning the design of the Weldolet joinder of the 12 and the 30 without explaining such failure gives rise to the presumption that such witnesses, if produced, would give testimony adverse to the position of Hudson."

The District Judge refused to give it.

The relevant general rule is stated in C.J.S. as follows:

> "It is discretionary with the court whether to give an instruction as to the failure of a party to produce evidence within his control, and a failure to do so is not necessarily error, *although under the circumstances of the case it may be,* * * *." 88 C.J.S. Trial § 312, p. 830.

I would not hold that, standing alone, the denial was reversible error or an abuse of discretion. I ponder, however, as to whether, in the total context, fairness would have been served by such an instruction. The failure to give it adds to my concern as to whether the procedure employed detracted from Steel having a fair trial. With some reluctance, I am constrained to say that, however unwittingly, the trial judge did not exercise his discretion with desirable detachment.

Because of impressions gained from my review of the trial, I am led to the opinion that the District Judge's refusal to allow Steel to use its proposed rebuttal witness visited substantial disadvantage upon it. There is no way, at this distance, to determine what may have been the probative worth or the jury's appraisal of the testimony that might have been given by Steel's proposed rebuttal witness. I consider that the trial judge's ruling was error—that it was not within his power to deny Steel's request; if his ruling was an exercise of discretion, I would hold that it was an abuse of such discretion.

I would reverse and remand the cause to the District Court for a new trial.